Loretta Roach (now Loretta Null), Appellant, v. Herz-Oakes Candy Company and Mercantile-Commerce Bank and Trust. Company.—No. 40557.—212 S. W. (2d) 758.

Division One, July 12, 1948.

*Carl A. Enger, Joseph N. Hassett* and *Ernest E. Baker* for appellant.

*Evans & Dixon, Wm. W. Evans* and *John F. Evans* for Herz-Oakes Candy Company, respondent.

*Wilton D. Chapman* for Mercantile-Commerce Bank and Trust Company, respondent.

[759] VAN OSDOL, C.—Action for $10,000 damages for the wrongful death of plaintiff's former husband, Mellbourne W. Roach, a window washer who was killed, the result of falling from the fourth-story window of a building belonging to defendant Mercantile-Commerce [760] Bank and Trust Company and situate at 514 Locust Street in St. Louis. The defendant Herz-Oakes Candy Company was joined as a party defendant on the theory such defendant was in the occupancy and control of the building as the lessee of defendant Trust Company.

At the conclusion of plaintiff's evidence, the trial court sustained defendants' motions for a directed verdict, and plaintiff has appealed from the consequent judgment for defendants.

Plaintiff in her petition alleged that the window which plaintiff's decedent was washing when he fell was in a dangerous and defective condition; that defendants were negligent in permitting the window to become and be in such condition, in assuring plaintiff's decedent the window was safe for washing, in suffering and permitting the window washing when defendants knew or should have known the window was in a dangerous and defective condition, and in failing to warn the deceased of the window's condition. Defendants by answers tendered the general issue and set forth affirmatively contributory negligence and assumption of risk.

Plaintiff-appellant contends the evidence was substantial and sufficient in tending to show defendant Candy Company was in control of the building; that defendant Candy Company owed deceased the duty to have the window safe for washing in the usual and customary way; and that defendant Candy Company knew of the window's defective condition. And plaintiff-appellant urges there was substantial evidence tending to show defendant Trust Company, the owner and lessor, had assumed the duty of repairing the windows and was negligent in failing to repair them so that they were reasonably safe.

It is contended by defendant-respondent Candy Company that it was not in such occupancy or control of the building as to make it legally responsible; that the deceased was an employee of an independent contractor and so was at best merely an invitee or business

visitor, and Candy Company had only the obligation to warn deceased of hidden dangers known to Candy Company and unknown to plaintiff's decedent; that under the circumstances shown in evidence Candy Company had no duty to inspect the premises; that, if the death was caused by a latent defect in the window, Candy Company could have had no knowledge thereof or, if the window was obviously dangerous, Candy Company had no duty to warn; and that the circumstantial evidence does not point to the liability of either defendant to the exclusion of other and more probable causes.

Defendant-respondent Trust Company contends it had not undertaken to repair the windows of the building (514 Locust) and that it, a lessor, is not liable to an invitee of its lessee for injury due to defects in the rented premises. Further, Trust Company says the deceased, an experienced window washer, in common prudence should have made a careful inspection of the window and should have taken precautions against the possibility of falling.

Consideration of these contentions requires careful examination of the evidence.

The building at 514 Locust is one of three buildings which are combined in one building unit. The building at 512 Locust had been occupied by defendant Candy Company as lessee of the owner, defendant Trust Company, for a term ending in 1942. In April 1941, the defendants were negotiating for renewal of the lease on the building at 512 Locust, and for the renting of additional space in the building at 514 Locust including the fourth floor thereof. April 26th defendant Candy Company wrote defendant Trust Company a letter confirming the previous discussions relating to the contemplated lease, which letter contained the following paragraphs,

"Our renewal of the lease at 512 Locust Street is predicated on the premises being put into tenantable condition, which includes resurfacing of the floors, repairing of the windows, reconditioning the building front to remove its hazards to pedestrian safety and its unsightly paintless appearance.

"Our leasing of the additional space at 514 is likewise predicated upon the building being put into tenantable condition as to smooth floors, sprinkler protection, front refinished to match 512 front, approved freight elevator facilities, and openings [761] broken through on upper floors near front of the building to permit entrance and egress between the two addresses."

A written agreement of lease was signed as of date August 1, 1941, for a stipulated term of six years beginning "on the First day of August, 1941." The lease contained the provision "that the rent to be paid by the Lessee for that part of the whole demised premises described as being part of the building 514 Locust . . . shall be adjusted to begin upon delivery of possession of said premises."

The president of Candy Company testified that the agreement of lease was not signed by Candy Company until some time in May 1942, and that. Candy Company commenced paying rent January 1, 1942. Nevertheless, it may be reasonably inferred defendant Candy Company had prior to November 8th entered upon the premises at 514 Locust and, as observed infra, had arranged to wash the windows at that address.

Sometime after the letter of April 26th, defendant Trust Company engaged a contractor, Morrison, to remodel and improve the buildings on a "cost-plus" basis. It is inferred this work was pursuant to the terms of the letter of April 26th. This work was in progress on November 8th and continued until the latter part of December 1941. The contractor testified the work on the windows "was the last thing we did . . . generally speaking, the glazer would glaze the window, and we would afterwards renew any rotten sash cord, or whatever it may be, and repair the windows."

Plaintiff's decedent had been engaged in the occupation of window cleaner for twenty years. He was an employee of Meier House and Window Cleaning Company, which company specializes in window washing. Defendant Candy Company had an "arrangement" with Cleaning Company to wash the windows of the building at 512 Locust, "once a month." Sometime in October 1941, defendant Candy Company "arranged" with Cleaning Company to "wash and scrape and putty" all windows (except those of the first floor) of the building at 514. Locust for the sum of $15. The Cleaning Company supplied its own cleaning materials and its own tools, and washed windows according to its own methods. Its employees "didn't take orders from somebody that happened to be around that building . . . wouldn't have followed any such orders if they had given them." Two window washers, Earp and Allen, were sent out "somewhere around the middle part of the month" to clean the windows at 514 Locust. They "went down there for the purpose of washing all the windows." The windows were "tall." An experienced window cleaner described a method used to clean such a window, "I would raise the bottom sash up and get out and pull it down, and pull the top one down, and wash it, and pull it up and wash the bottom side." The "tops (of some of the windows) wouldn't come down, and the bottoms wouldn't raise, and the ropes were broke . . . some of the windows were rotten." Earp, one of the window cleaners, testified he told a man "in the office" that "we couldn't clean them all because some of them were in bad shape, and wouldn't come down, and I couldn't raise them up, and the ropes were broke, and it was too dangerous to get out on them . . . he says to do what I could, to wash what I could, and by next month he would see that the windows were in working order . . . he sent a carpenter up,

and he went along in front of us, and loosened what windows he could up for us. We could get some of them and some of them we couldn't."

On the following November 8th, plaintiff's decedent was seen washing windows on the fourth floor of the building at 514 Locust. He was last seen "moving toward the back of the building" and on that floor. He did not return to his home that evening. No witness testified plaintiff's decedent was thereafter seen alive.

Two carpenters (employees of the contractor Morrison) testified they were told by their employer to go to the fourth floor of 514 Locust "and fix a window that was loose up there . . . one window, the top sash of the window was hanging by the sash cord . . . out of the frame." The carpenter Morrison testified his attention was called to the fact by "a Mr. Herz." This was sometime subsequent to [762] November 8th. The carpenters put the sash "back in place and put some nails under it to hold it in place." This was the window below which deceased's body was found. November 12th, deceased's body was found on an areaway level forty or fifty feet below the window, "the body was lying right below the window." The window had not been washed. One witness testified the window was "not (then) nailed up; it was just hanging there." Other witnesses testified the window was then closed; "it had been nailed up . . . there were some little blocks put under it to hold it up." There was "a sliver of wood lying on the window sill . . . I would say between five and seven inches long, maybe as big around as your little finger and came to a point . . . it would come off the top of the sash where the man would have a hold." And it was said there was a small strip along the upper sash that appeared to have been splintered, it was at "the side of the window . . . on the outside of the sash, to hold the sash in place in the frame."

■ Attending the question of the sufficiency of the evidence to make out a case against defendant Candy Company—In some instances a contractee may owe an independent contractor or an independent contractor's employee the duty to furnish reasonably safe appliances and a reasonably safe place in which to work, a responsibility measurably like that of an employer to his employee. Generally such instances are those where the contractee has undertaken to furnish and has retained the control of the place and appliances in and with which the independent contractor is to perform his contract. Jewell v. Sturges and Kansas City Bolt & Nut Co., 245 Mo. 720, 151 S. W. 966; Cummings v. Union Quarry & Construction Co., 231 Mo. App. 1224, 87 S. W. 2d 1039; Kiehling v. Humes-Deal Co., Mo. App., 16 S. W. 2d 637.

In the instant case the plaintiff's decedent was the employee of another who had contracted to do window-cleaning work for defendant Candy Company. Candy Company was interested in and paid for the result of the work. Deceased was an experienced window

cleaner who worked with the appliances and cleaning materials supplied by himself or by his employer, the contractor. His work was of brief duration, and executed by the methods and in the manner of his own special work, free of the supervision or control of the defendant Candy Company and which work, it is inferred, was not that in which Candy Company was engaged or in which Candy Company's officers had any special knowledge, or experience or supervisory skill. He came and went at his own pleasure, or that of his employer. In these circumstances, it seems to us it should not be held defendant Candy Company had the full responsibility of an employer. See Annotation, 44 A. L. R., p. 932, at pp. 938-944. Rather would it be just to hold, in the circumstances, the plaintiff's decedent was an invitee to whom Candy Company would be liable for injury "occasioned by any unsafe condition of the premises encountered in the work, which was known to it but unknown to him; but was not liable for injuries resulting from conditions obviously dangerous and known by the deceased to be so." Stein v. Battenfeld Oil & Grease Co., 327 Mo. 804, 39 S. W. 2d 345; Streicher v. Mercantile Trust Co., Mo. Sup., 31 S. W. 2d 1065; Feldewerth v. Great Eastern Oil Co., Mo. App., 149 S. W. 2d 410; McLaughlin v. Creamery Package & Manufacturing Co., Mo. App., 130 S. W. 2d 656.

In the case of Streicher v. Mercantile Trust Co., supra, cited by plaintiff, the defendant knew the window sashes were in such a defective condition that they could easily be pushed outwardly. "Sometimes the wind would push out the sashes." The condition of the sashes had been reported and demonstrated to defendant but nothing was done to remedy the condition. Defendant knew plaintiff's method of painting would be hazardous in view of the known fact the sashes were insecure, and should have warned plaintiff of the danger. In the instant case there is no evidence defendant lessee knew of any defect in the window from which plaintiff's decedent fell.

Plaintiff contends the effect of the testimony of the statement to defendant Candy Company by Earp that "some of the windows were rotten" was to impute knowledge to such defendant of the defect in the [763] window in question. Plaintiff urges that actual notice or knowledge often means knowledge of facts and circumstances sufficiently pertinent in character to enable reasonably cautious and prudent persons to investigate and to ascertain "the ultimate fact"; citing Weed v. American Car & Foundry Co., 322 Mo. 137, 14 S. W. 2d 652. Applying plaintiff's argument to the instant case, "the ultimate fact" would be that defect which let the window come out of the frame. Was the defect hidden or obvious? There was no evidence introduced tending to show the appearance of the window prior to the casualty whereby it could be reasonably determined what defect, if any existed, caused the window to come out of the frame. There

is no evidence the window involved in the casualty was latently rotten. And it was not shown there was a defect in the window which was not obvious to plaintiff's decedent. If the defect were obvious, plaintiff's decedent must have seen it and assumed the risk of injury due to the obviously defective condition. Stein v. Battenfeld Oil & Grease Co., supra. The only evidence tending to show the window was in a defective condition was the testimony that, after the casualty, there were slivered-off portions of the sash or of the side of the frame found upon the window sill. No attempt was made to further describe the apparent condition of the splinters or to otherwise describe the window, its frame and their condition. The fact that pieces of the sash or frame were slivered off after the casualty does not have substantial probative force in tending to prove that the sash came out of the frame because the sash or the frame was latently rotten and defective, nor does it tend to prove in what respect, if any, the sash or frame was otherwise defective. Compare Feldewerth v. Great Eastern Oil Co., supra.

In our opinion the trial court was right in sustaining Candy Company's motion for a directed verdict.

█ Attending the question whether the evidence introduced was sufficient to make out a submissible case against the lessor, defendant Trust Company—In the absence of a covenant or agreement to that effect, the lessor is not required to make repairs or keep the premises in a safe or suitable condition, and is not ordinarily liable in tort to the lessee or to others lawfully on the demised premises because of defects in the premises demised. Mahnken v. Gillespie, 329 Mo. 51, 43 S. W. 2d 797; Shaw v. Butterworth, 327 Mo. 622, 38 S. W. 2d 57. When the landlord in compliance with an agreement or voluntarily "undertakes" to make repairs, however, he has the duty in acting to exercise due care. Bartlett v. Taylor, 351 Mo. 1060, 174 S. W. 2d 844; Lasky v. Rudman, 337 Mo. 555, 85 S. W. 2d 501; Shaw v. Butterworth, supra; Huffman v. Home Owners' Loan Corporation, 150 F. 2d 162 and Home Owners' Loan Corporation v. Huffman, 124 F. 2d 684; Marks v. Nambil Realty Co., 245 N. Y. 256, 157 N. E. 129.

And a lessor of land, "who conceals or fails to disclose to his lessee any natural or artificial condition involving unreasonable risk of bodily harm to persons upon the land, is subject to liability for such harm caused thereby to the lessee and others on the land with the consent of the lessee . . . if the lessee does not know of the condition or the risk involved therein, and the lessor knows of the condition and realizes the risk involved therein and has reason to believe that the lessee will not discover the condition or realize the risk." Vol. 2, Restatement of the Law of Torts, sec. 358, p. 969; Burton v. Rothschild, 351 Mo. 562, 173 S. W. 2d 681; Bartlett v. Taylor, supra; Mahnken v. Gillespie, supra; Whiteley v. McLaughlin, 183 Mo. 160, 81 S. W. 1094.

Plaintiff has cited cases wherein there was shown active causal negligence in lessors' undertakings to repair; for example, see the case of Lasky v. Rudman, supra, wherein the defendant landlady had undertaken to repair a porch railing. In so doing, she had the duty to exercise reasonable care to discover and repair the rotten condition of the railing so as to make it reasonably safe. In the case of Bartlett v. Taylor, supra, cited by plaintiff, the landlord volunteered to substitute electric wiring for the "worn" cable on a garage door. The questions whether the changed condition was one which should have been reasonably known to be unsafe [764] and whether the landlord was negligent in failing to warn the tenant of the changed condition were for the jury. In Shaw v. Butterworth, supra, plaintiff's mother in negotiating the rental contract advised the defendants (landlord and his agent) she wanted screens put in the windows so that her children would not fall out, and defendants agreed. Defendants set a screen in a rusty cleat or groove, which was also defective in being bent outwardly. Having undertaken to put in the screen, it was defendants' duty to make an "ordinarily careful inspection" of the groove at the time to ascertain its condition. In the case of Marks v. Nambil Realty Co., supra, a landlord assumed to act in the repair of the support of a cellar stairway. He "made a bungling job of it." Having assumed to act, he had the duty to act carefully.

It could be inferred the contemplated work of the remodeling or renovation of the building at 514 Locust did not originally include the repair of the windows of 514 Locust. However, the evidence tends to show the lessor had reglazed some of the windows and, it may be inferred, the lessor had, on November 8th, repaired some of the windows, having apparently arranged with the contractor, Morrison, to do that work. Yet there is no evidence introduced showing the lessor through the contractor Morrison *negligently* repaired the windows, November 8th, when the plaintiff's decedent fell; indeed, there was no evidence the lessor, Trust Company, or its contractor had then done any work in repairing the window from which deceased fell. As has been seen supra, the basis of tort liability of the lessor to the lessee or to those rightfully on the premises is active negligence in the repair of the premises, and not the failure to do something the lessor had agreed to do. The evidence tends to show the arrangement for the window washing was made by defendant Candy Company with deceased's employer, and no evidence was introduced tending to show the defendant lessor had knowledge of the arrangement and had assured the lessee or its invitee, plaintiff's decedent, that the windows were repaired so they would be safe for washing. In the circumstances shown in evidence, the most that could be said is that the repair and renovation was in progress, and there was no evidence defendant lessor had negligently done anything it had undertaken to do.

We bear in mind there was no evidence showing the nature and appearance of the window prior to the casualty whereby it could be reasonably determined what defect (if a defect existed) let the window come out of its frame. Assuming there was a hidden defect in the window at the time the lessee entered upon the premises, there was no evidence introduced tending to show defendant lessor had notice or knowledge, actual or constructive, of the defect. But if the defect were obvious, it was. one the lessee (and its invitee) should have seen. Burton v. Rothschild, supra.

In our opinion the trial court correctly sustained the defendant Trust Company's motion for a directed verdict. Burton v. Rothschild, supra; Byers v. Essex Inv. Co., 281 Mo. 375, 219 S. W. 570.

The judgment should be affirmed.

It is so ordered. *Bradley* and *Dalton, CC.,* concur.

PER CURIAM:—The foregoing opinion by VAN OSDOL, C., is adopted as the opinion of the court. All the judges concur.