**Helen RECKERT, Appellant,**

v.

**ROCO PETROLEUM CORPORATION, a Corporation, and Otto Evans, Respondents.**

**No. 51720.**

Supreme Court of Missouri,
Division No. 1.

Dec. 30, 1966.

Motion for Rehearing or for Transfer to
Court En Banc Denied Feb. 13, 1967.

James F. Koester, St. Louis, for plaintiff-appellant.

F. X. Cleary, Paul S. Brown, J. C. Jaeckel, Moser, Marsalek, Carpenter, Cleary & Jaeckel, St. Louis, for Roco Petroleum Corporation, respondent.

HOUSER, Commissioner.

Death action by Helen Reckert, widow of William, an employee at a gasoline filling station burned to death when gasoline escaping from the tank of a station wagon on a hydraulic grease rack caught fire and exploded.

Standard Oil Company, allegedly the owner of the filling station, Roco Petroleum Corporation, lessee, and Otto Evans, sublessee, were originally named as defendants. Standard was dismissed. The jury exonerated Evans and returned a verdict for $25,000 against Roco. A new trial was granted Roco on the ground that the court erred in giving Instruction No. 2, and plaintiff appealed.

The first question is whether, considering the evidence in the light most favorable to plaintiff, plaintiff made a submissible case of negligence against Roco.

The written lease between Roco as lessor and Evans as lessee covered fixtures, equipment and appliances. The rental was not only for the use and enjoyment of the real estate and buildings but also was specified to be for the use of the equipment. Under the lease Evans was to handle Roco's products exclusively. Lessee Evans was bound to keep the equipment in repair and lessor had a right to inspect the premises to insure lessee's performance of this obligation. In the writing lessee acknowledged that he had examined and knew the condition of the equipment and appliances and that they were received in good order and repair. The lease provided that lessor was to be exonerated and indemnified against liability arising out of the condition, use and operation of the property and premises. No provision of the lease was to be construed as reserving to lessor any right to exercise any control over the business or operation or to direct how it should be conducted, "it being understood and agreed that the entire control and direction of such activities shall be and remain with the Lessee." Lessee was to have no authority to employ any persons or agents for lessor and lessee was not to be deemed to be the employee of lessor. A separate loaned equipment agreement executed between the same parties at the same time contained an acknowledgment by Evans that he had in his possession the hydraulic grease rack and granted him the right to use it. This agreement also contained an indemnification clause holding Roco harmless as against any liability arising out of injury to persons caused by or resulting from the condition or use of the equipment, whether caused by improper construction or negligence.

The grease rack consisted of two parallel I-beams joined at the middle, attached to a hydraulic piston capable of raising an automobile. When the rack was in a "down"

position the beams rested on the floor. An automobile would be "run on" with its wheels on each side of the I-beams. By turning a valve compressed air would raise the rack until it came in contact with the front axle and rear axle housing. The front axle would rest on stationary pieces of metal attached to the I-beams. The rear axle housing would rest on flanges or "dogs." These dogs were moveable and could be adjusted to accommodate automobiles of differing lengths by sliding them along the I-beams. When properly positioned the automobile would be lifted to the desired height for servicing.

Here is a picture of one of the I-beams, showing a flange or "dog" in upright or vertical position:

The dogs would be turned down in a horizontal position when an automobile, straddling the beams, would be driven into position over the rack. The filling station attendant would get down on his knees and by the use of an attached rod or handle would slide the dogs along the beams to the back axle housing. The dogs would then be turned upright in a vertical position so that when the grease rack was elevated the circular cut-out portions of the top part of the dogs would accommodate or fit around the bottom of the rear axle housing, thus providing support for the automobile as it was lifted.

This accident occurred in March, 1964, during Evans' operation of the filling sta-

tion. Evans' predecessor as lessee was Hubert Parks. Parks testified that often the dogs would fall over to the side after being placed in position and before the rack was lifted. In November, 1963, during Parks operation, there was an accident involving this same grease rack. On that previous occasion the tank of a 1956 model Chevrolet station wagon was punctured. Parks testified as follows: "* * * I got the dogs set and went to the valve to turn the air to lift it and while I was doing that one of the dogs fell over and * * * let the car come down and left the one dog that was standing up puncture the tank, and all the gas escaped from it." It was not the dog that fell over that punctured the tank; it was "[t]he one on the other side." The inquiry continued: "Q Did you report that back to Roco Petroleum, their employee, or agent? A Mr. Metze, yes. Q Would you tell the Jury whether or not you told him that you had had that happen, *that it punctured a gas tank?* A I certainly did." (Our emphasis.) Roco's supervisor told Parks that Roco would remedy the situation "as soon as they could," but that they were so busy installing new stations that he did not know when it could be done. When Evans commenced operating the station no one from Roco showed Evans how to operate the rack. Evans found that the rack was damaging the front end of "our modern automobiles." He complained of this to two different officials of Roco, stating that the rack "was insufficient for the new model automobiles," and several times requested that Roco install a new rack. These complaints were made about 60 days before the accident happened. The only difficulty Evans experienced with the rack from the time he leased the station in January until the accident in March related to the inefficiency of the rack in causing misalignment of the front wheels of automobiles placed thereon. Apparently he had no experience with the dogs falling. He testified that the dogs "were doing what they were supposed to do." It was not until after the accident in question

that Parks told Evans about the previous incident in which the gasoline tank of a Chevrolet station wagon had been punctured. Notwithstanding the two tenants had requested that the rack be replaced Roco did nothing; did not undertake to repair the dogs, change, remodel or replace the rack, and did not send anyone to make an inspection of the rack. Roco, however, did make some repairs of the building and equipment, repaired the furnace and replaced a broken pane of glass in the overhead door.

On the day in question, during Evans' operation of the station, the former tenant Parks drove his 1957 Chevrolet station wagon into the station and onto the grease rack to have work done on his master brake cylinder. Evans got down on his knees and slid the dogs forward to place them under the axle housing. The top cut-out of the dogs accommodated cars having 15-inch wheels. The lower cut-out was used in the case of cars having 14-inch wheels. In positioning the dogs for cars with 15-inch wheels the operators had to be careful to place the dog at the right place so that when the rack was lifted the dogs would come in contact with the axle housing, but in positioning dogs for cars with 14-inch wheels the operator pushed the dogs forward until the dog came in contact with the axle housing. When that point was reached the operator knew the position was right because the rear of the dog protruded above the bottom of the axle housing, and this prevented the dog from being pushed any farther forward. Thus the housings of automobiles with 14-inch wheels always rested in the front cut-out and those of 15-inch-wheel automobiles rested in the back cut-out of the dogs. The back part of the top extended back 5½ inches from the center of the dogs. In the case of some automobiles, particularly 1956 and 1957 Chevrolet station wagons, holes would be punched in the gasoline tanks when they were lifted, regardless of how carefully the dogs were positioned, because of the manner in which the rack was designed and had to be used.

This was due to the fact that in the construction of those models the gas tank is located within 5 inches of the dog. These models have 14-inch wheels, which meant that their rear axle housings would rest in the front cut-outs. This left 5½ inches or so of metal extending backwards from the housing, so that when the lift was pushed upwards the back top portion of the dogs would puncture the gas tank. The dogs were properly positioned and used the way they were intended to be used. Evans knew before the upward movement began that the dogs were going to come in contact with the axle housing "in the cutaway" but he did not know where the dogs were in relationship to the gas tank, because the vision of one looking underneath was obstructed by the spare tire carrier. After he positioned the dogs he raised the lift. The top portion of one of the dogs punctured the gasoline tank. Gasoline ran out of the hole in the tank onto the floor of the filling station. Evans' employee William Reckert was working underneath a car next to the grease rack. The gasoline caught fire from a flame in a burner in the station and there was an explosion. In the holocaust Reckert received fatal burns.

In Paragraph 6(a) of the petition defendants were charged with operating the grease rack at a time when they knew or in the exercise of ordinary care could have known that the rack was defective and as a result an automobile might be caused to shift, slide or fall and thereby creating a dangerous and hazardous condition and situation to persons in the immediate area.

In Paragraph 6(e) of the petition defendants were charged with maintaining and continuing to use a dangerously constructed grease rack not reasonably safe for use with modern automobiles, including the one in question, in that using it as intended there was a reasonable probability or likelihood that it would puncture a gasoline tank and thereby create a situation of danger, and in failing to warn plaintiff of the likelihood of danger.

The negligent breach of duty charged against the lessor relates to a piece of equipment normally used and found in gasoline filling stations. The one to whom the duty is claimed to have been owed was an employee of the lessee who operated the filling station; one whom lessor could reasonably expect to be and work in the vicinity of the grease rack.

The defense is that lessor owed the employee no duty greater than that owed the lessee; that this is a landlord and tenant relationship under which lessor owed lessee no duty except on proof of a latent defect known to lessor at the time of the letting, not disclosed to lessee at the time of the letting and not discoverable by lessee in the exercise of ordinary care; that the grease rack and its parts were open, obvious and in plain view at all times and that there was no latent defect; that no act or omission of Roco caused the accident; that whatever liability there was rested upon lessee and not lessor; that this is not a bailment case, but if it is there is nevertheless no liability on Roco as bailor because the condition of the rack and its parts was open and obvious to the bailee; that plaintiff may not rely upon the theory that the rack was inherently dangerous because she did not proceed on that theory below.

■ The relationship between Roco and Evans was that of landlord and tenant, Elbers v. Standard Oil Co., 331 Ill.App. 207, 72 N.E.2d 874 [4], and Roco's liability in this case is governed by the principles of the law of landlord and tenant. Employees of a tenant are on the leased premises in the right of the tenant and not as licensees or invitees of the landlord. The duties and liabilities of a landlord to those who enter the leased premises under the tenant's title are the same as those owed to the tenant. A tenant's employees have no greater rights against the landlord than the tenant himself. Darlington v. Railway Exchange Bldg., Inc., 353 Mo. 569, 183 S.W.2d 101; Bender v. Weber, 250 Mo. 551, 157 S.W. 570, 46 L.R.A.,N.S., 121; Burks v. Buck-

miller, Mo.App., 349 S.W.2d 409; 32 Am. Jur. Landlord & Tenant § 665.

■ The general rule is that the landlord is not liable to the tenant or to those on the premises under the tenant's title for injuries caused by a dangerous condition, whether natural or artificial, which existed at the time the tenant took possession under the lease. Warner v. Fry, 360 Mo. 496, 228 S.W.2d 729; Restatement of the Law of Torts, 2d, § 356; 32 Am.Jur. Landlord & Tenant § 665. This general rule is subject to an exception where at the time the lease is executed there is a dangerous condition of the premises involving unreasonable risk of physical harm to persons on the premises, which is known to the landlord and not known to the tenant and not discoverable by the tenant in the exercise of ordinary care. In such case there is a duty on the landlord to disclose to the tenant the existence of the dangerous condition and he is liable to the tenant or the tenant's invitees for injuries or death resulting from such condition if the landlord fails to disclose them to the tenant or conceals their presence from the tenant. Begley v. Adaber Realty & Inv. Co., Mo.Sup., 358 S.W.2d 785, 791; Roach v. Herz-Oakes Candy Co., 357 Mo. 1236, 212 S.W.2d 758; Bartlett v. Taylor, 351 Mo. 1060, 174 S.W.2d 844; Underwood v. Moloney, Mo.App., 397 S.W.2d 18; Burton v. Rothschild, 351 Mo. 562, 173 S.W.2d 681; Coates v. Dewoskin, Mo.App., 379 S.W.2d 146; Flournoy v. Kuhn, Mo. App., 378 S.W.2d 264; Grimmeissen v. Walgreen Drug Stores, Mo.App., 229 S.W.2d 593; 32 Am.Jur. Landlord & Tenant § 671, p. 539; 52 C.J.S. Landlord and Tenant § 417 a. (3).

■ Actual knowledge on the part of the landlord of the dangerous condition is not necessary to make a case under this exception. It is sufficient that the landlord "had knowledge of facts from which he ought to have known, or will be presumed to have known," of the defect, Meade v. Montrose, 173 Mo.App. 722, 160 S.W. 11, or, according to the Restatement of the Law of Torts, 2d, § 358, that the landlord "knows or has reason to know of the condition, and realizes or should realize the risk involved, and has reason to expect that the lessee will not discover the condition or realize the risk." The rule is thus stated in "Tort Liability of a Landlord," by Harkrider, 26 Mich.Law Review 260, 268: "The landlord, as a rule, need not, before leasing the premises, look for defects therein. But if he has knowledge of facts that would lead a reasonable man to suspect that defects actually exist, he should disclose such facts to the prospective tenant. If he fails to do so he will be charged with knowledge of what a reasonable inspection would have disclosed. To impose any further obligation upon him would render him to a great extent an insurer against concealed defects and dangers. On the other hand he cannot close his eyes to facts that would lead reasonable men to act." Prosser says that it is enough that the landlord is "informed of facts from which a reasonable man would conclude that there is danger." Prosser on Torts, 3rd ed., § 63, p. 413.

■ Applying these rules to the facts of this case, lessor Roco had actual knowledge, prior to the letting to Evans, that there was a dangerous condition of the grease rack, in that the gasoline tank of a 1956 Chevrolet station wagon had been punctured when it settled down onto an upright dog, thereby discharging its gasoline into the building. Actual knowledge of the defective condition of the grease rack which permitted this to happen was actual knowledge of a fact which a jury reasonably could find would lead the managing agents of the lessor to suspect that the grease rack had inherently dangerous characteristics, thereby requiring the lessor to "exercise reasonable diligence to satisfy himself of their nonexistence before leasing, without mentioning the matter to his tenant." Meade v. Montrose, supra, 160 S.W. 1. c. 13. Roco was engaged in the business of leasing numerous filling stations in which its products were exclusively sold. As an experienced lessor of filling stations, having

a commercial interest in the provision of filling station equipment which the public was invited to use and which Roco knew its tenant and his employees would be using frequently, Roco should have appreciated the danger attending the use of hydraulic grease racks. A jury might well have found that if Roco had made a reasonably diligent investigation when the incident occurred in November, 1963 it would have discovered that the gasoline tanks of station wagons of this make and vintage were so located that dogs on this type of rack would puncture them when lifted. In any event, a jury could reasonably find that Roco, as an experienced lessor of this equipment, with a commercial interest in supplying it, might reasonably have foreseen that some type of injury might occur to Evans or his employees as a result of the continued use of this grease rack. The fact that a dog fell over on the previous occasion does not relieve Roco of liability because that fact could be found coincidental and not a causative factor, in view of the testimony that it was the upright remaining dog that punctured the tank. Liability does not depend upon whether a defendant reasonably and in the exercise of ordinary care could have foreseen or ought to have foreseen the very injury complained of, or "the precise manner in which the injury occurred," but a defendant may be held liable for any injury which, after the casualty, appears to have been the natural and probable consequence of his act or omission, if he might reasonably have anticipated that injury *of some kind* would result. Miller v. Brunson Const. Co., Mo.Sup., 250 S.W.2d 958, 960 [4]; Boyd v. Terminal R. Assoc. of St. Louis, Mo.Sup., 289 S.W.2d 33, 37 [3], 58 A.L.R.2d 1222; McLeod v. Linde Air Products Co., 318 Mo. 397, 1 S.W.2d 122.

■ Accordingly, we are of the opinion that this case comes within the exception; that a submissible case of negligence was made by showing that Roco was in the business of leasing numerous filling stations for the exclusive sale of its products; that

during the term of the preceding lease Roco's supervisors were informed that a 1956 Chevrolet station wagon had its tank punctured by reason of an accident on this grease rack; that Roco's supervisors were advised by the tenant of other shortcomings in the grease rack and were requested many times to replace it; that Roco knew or had reason to know that there was a concealed potential danger in the operation of the rack, and realized or should have realized that there were risks involved in its use; that this knowledge was communicated to Roco's supervisors more than sixty days before the accident in March, 1964; that nevertheless Roco leased to Evans and supplied him with a grease rack so constructed and constituted that even when used carefully and in the manner intended gasoline tanks on certain types of automobiles lifted thereon were likely to be punctured, thereby releasing gasoline, a combustible substance, with consequent danger of fire and explosion; that Roco did not warn Evans of the dangers involved or disclose the existence of the dangerous condition; that Evans did not know or have reason to know of the dangerous characteristics of the rack; that the dangerous condition was of such a nature that it would not be known to lessee Evans by an inspection of the rack, and would not be discoverable by him in the exercise of ordinary care; that Roco permitted the continued use under the lease of this mechanism with a dangerous potential, and that plaintiff's decedent, lawfully on the premises in the right of the lessee, received fatal burns as a result of exposure to this situation of danger.

■ Roco argues that there is nothing to show that there was any latent defect or other defect in the grease rack; that it was open, obvious, and the rails or dogs were in plain view; that Evans stated in writing that he had examined the lift, found it in good order and repair and testified that he was familiar with its operation and had used it many times prior to the accident. It is true that there was no latent defect in the conventional sense of the term; that is,

there was no hidden crack, fault, or vice existing in the material itself, not discoverable by mere observation or inspection. There was, however, a latent fact or characteristic about this rack which visual inspection by a person of ordinary education would not have revealed, but which, according to the evidence, involved a certain danger. Evans, the tenant, could not have known of this dangerous condition except by receiving the information from others or actual experience. Under these circumstances Evans' execution of the lease acknowledging that he had examined the lift and found it in good order and repair would not keep plaintiff from invoking the undisclosed dangerous condition exception.

▉ The next question is whether the court erred in granting Roco a new trial for error in giving Instruction No. 2, which follows:

"Your verdict must be for plaintiff and against defendant Roco Petroleum Company if you believe:

"First, plaintiff was the wife of deceased, William Reckert, and

"Second, defendant Roco Petroleum Company leased the service station with a grease rack lift therein to defendant Otto Evans, and

"Third, that said grease rack lift was dangerous for use on some modern day automobiles, including the automobile in question, and

"Fourth, defendant Roco Petroleum Company knew or should have known of such danger, and

"Fifth, that defendant Roco Petroleum Company supplied and provided for use, said grease rack lift used by defendant lessee, Otto Evans, which caused a hole or holes to be punctured into the gas tank of the automobile in question, and

"Sixth, that defendant Roco Petroleum Company was thereby negligent, and

"Seventh, that as a direct result of such negligence William Reckert died."

Instruction No. 2 unnecessarily deviates from MAI No. 26.01, contains modifications not tailored to fit the facts in this case, and omits essential elements. The court properly ruled that it committed reversible error in giving this instruction. In resubmitting the case MAI No. 26.01 should be given, modified however to require that the jury believe the existence of the following essential elements: that the grease rack was so constructed and constituted that it was likely to puncture gasoline tanks of 1956 and 1957 Chevrolet station wagons and was thereby dangerous to persons in the vicinity of its probable use while it was being used in the manner and for the purpose intended; that lessor knew or by using ordinary care could have known of the dangerous condition; that lessor had reason to expect that lessee Evans would not discover the dangerous condition or realize the risks involved, and that lessor failed to disclose the dangerous condition to lessee Evans.

The order granting a new trial is affirmed and the cause is remanded.

WELBORN, C., dissents.

HIGGINS, C., concurs.

PER CURIAM.

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

HENLEY and HYDE, JJ., and STORCKMAN, Alt. J., concur.

HOLMAN, P. J., not sitting.