**CAPSCO PRODUCTS, INC., d/b/a Bis-Man Sea Ray Boats, Plaintiff and Appellant,**

v.

**Robert SAVAGEAU; Bianco Realty, Inc., Defendants and Appellees,**

**Caroline F. Shinnick and Larry Shinnick, individually, and Caroline F. Shinnick as Trustee, Defendants.**

**Civ. No. 920206.**

Supreme Court of North Dakota.

Dec. 14, 1992.

Steven A. Storslee of Fleck, Mather & Strutz, Bismarck, for plaintiff and appellant.

John M. Olson of Wheeler Wolf Law Firm, Bismarck, for defendants and appellees.

VANDE WALLE, Justice.

Capsco Products, Inc., leased a building in which to store its business inventory. Capsco's inventory was damaged by a break in the building's sprinkler system, and Capsco filed suit against a group of defendants including the broker and realty company, as well as the owner. Capsco appealed from a district court judgment which granted the defendants' summary judgment motion. We reverse and remand.

Caroline F. Shinnick and Larry Shinnick, individually, and Caroline F. Shinnick as Trustee [Shinnick] owned a building located at 1200 Industrial Drive in Bismarck. In the fall of 1988, Shinnick retained Bianco Realty and Robert Savageau, a broker with Bianco Realty, to list and sell the building. Savageau acted as the agent of Shinnick for the purpose of selling, and perhaps leasing the property. Although Savageau's goal was to sell the property, he, at various times, procured lessees for the building. He did this without compensation from Shinnick.

In October 1988, Hank Albers contacted Savageau and inquired as to the availability of a large facility to store some business and personal inventory. Savageau thought that the Shinnick property would suit Albers's needs, and contacted Shinnick for permission to lease the property. Shinnick consented, and Savageau acted as a messenger between Albers and Shinnick as they negotiated the lease. Albers and Shinnick entered into a lease, and Albers wrote lease checks out to Shinnick, but gave them to Savageau for Savageau to transmit to Shinnick.

In early 1989, representatives of the water, gas, and electric utility companies contacted Savageau, as the property's listing agent, about the nonpayment of the utility bills. Savageau informed them that Shinnick was responsible for paying the utility bills, but for one reason or another, Shinnick chose not to pay.

On January 18, 1989, Leo Rohrich, an employee of the Bismarck Water Department, requested Savageau to allow him entry onto the property to disconnect the water supply because of Shinnick's nonpayment. The building had two water mains—one for general use, and another to service the fire sprinkler system. Rohrich only disconnected the general use water main. In his affidavit, Rohrich claimed that he informed Savageau of the two different water mains, and that Savageau instructed him to leave the fire main on. Rohrich claimed that he told Savageau that the water main would freeze if the heat was not left on in the wintertime and Savageau assured Rohrich that the heat would be left on. In his deposition, however, Savageau claimed that he had no idea that the building was serviced by two water mains, that he did not instruct Rohrich to leave the fire main on, and that there were no discussions about heat being left on in the wintertime.

Sometime after January 18, but before March 1989, the electricity was turned off or failed, and the water in the fire sprinkler system froze. The reasons for the lack of electrical power are varied. Savageau claimed there was a temporary outage due to a short in the wiring; Capsco, though not a tenant at the time, claimed that the electricity had been entirely disconnected; and George Georgeson, an employee of

Nova Fire Protection, the company that repaired the sprinkler system, claimed that the power to the system's compressor had been manually turned off. Regardless, the freezing did extensive damage and the sprinkler system had to be replaced. We are not told if Albers suffered any damages as a result of this accident.

Sometime after March 1989, the gas heat was turned off in the building. By the summer of 1989, Albers was no longer leasing the building.

In the fall of 1989, Bob Heringer, owner of a boat dealership, contacted Savageau to inquire if the building Albers had been using (the Shinnick property) was available for lease. Savageau indicated that they were working on a potential sale, but the building might possibly be available on a month-to-month basis. Savageau claimed he received permission from Shinnick to lease the property to Heringer and collected a lease check made out to Shinnick.

Approximately one month later, Capsco purchased Heringer's business and sought to continue leasing the Shinnick property. Savageau met with Stan Puklich, the president of Capsco, and Darrel Vollmers, the controller and corporate treasurer for Stan Puklich Chevrolet, Inc. At this meeting, the three discussed the building, and Savageau informed them that all the utilities—gas, electricity, and water—were turned off. Although Savageau "did not know" if he had authority to bind Shinnick to a lease with Capsco, Savageau claimed an oral lease was entered into between Capsco and Shinnick. Capsco claimed they merely "assumed" the Heringer lease. However, in his Answer to Plaintiff's Interrogatories, Shinnick denied knowledge of any sort of lease.

On November 18, 1989, approximately two weeks after Capsco "assumed" the lease but before they mailed a lease payment, the water in the fire sprinkler system again froze and the pipes ruptured. The explanations for the rupture are varied, but whether it occurred due to the lack of electricity or the lack of gas, thousands of gallons of water filled the building, do-

ing extensive damage to Capsco's property stored therein.

On October 18, 1990, Capsco served a summons and complaint against Savageau, Bianco Realty, the Shinnicks individually, and Caroline F. Shinnick as trustee, for damages done to their property. The complaint alleged causes of action based upon negligence, breach of contract, and breach of warranty of habitability.

On March 26, 1992, the trial court granted Savageau's and Bianco Realty's motion for summary judgment and dismissed Capsco's claim against them based on breach of contract and breach of warranty of habitability. The court granted the motion as to the contractual claims because it concluded that Savageau and Bianco Realty were not party to the contract. The trial court also concluded that habitability is not a viable claim in connection with a commercial lease.

On July 12, 1992, the trial court granted Savageau's and Bianco Realty's motion for summary judgment and dismissed Capsco's claim against them based on negligence. The trial court made two express assumptions in this motion: (1) "Savageau and his principal, Bianco Realty, could be considered as managing agents for the Shinnicks," and (2) "Savageau knew or had reason to know that it was possible that the use that plaintiff intended to make of the premises being leased (cold storage for personal property) might not be compatible with the sprinkling system when there was no heat in the building during very cold periods." Relying on *Bellemare v. Gateway Builders, Inc.*, 420 N.W.2d 733 (N.D. 1988), the court held that a landlord owes no duty to a tenant to warn the tenant of conditions which could foreseeably cause damage to the tenant's property while stored pursuant to a business lease. In other words, there was no duty to warn Capsco of the possible hazards as the property leased was in a commercial setting. The trial court extended the summary judgment to Shinnick as well, dismissing all claims against them, individually and as trustee.

Capsco presents two issues for our consideration: (1) whether the trial court erred in ruling there was no question of fact with regard to a contract between Capsco and either or both Savageau, Bianco Realty, and the Shinnicks, individually and as trustee, and (2) whether the trial court erred in ruling that in a commercial lease, neither the landlord not the landlord's managing agent has a duty to disclose a hidden or latent defect on the rented premises which poses a foreseeable risk of injury or damage to the tenant's property.

### The Parties' Relationship

■ In his memorandum opinion and order, the trial judge wrote, "[i]n that connection, I am assuming for purposes of the motion that the evidence could be construed as establishing that Savageau and his principal, Bianco Realty, could be considered as managing agents for the Shinnicks." We do not believe that "managing agent" is a term of art, and interpret that term as indicating that Savageau was the agent of Shinnick for selling, leasing, and managing the property, i.e., to make sure that the utilities were on or off, etc. We agree with this determination.

The liability of the parties stemming from this relationship was not addressed by the trial court. In a deposition, Vollmers was asked about a supposed principal's role in the lease transaction:

"Q. Were you informed that Mr. Savageau was simply the listing agent for the sale of the building?

"A. No.

.    .    .    .    .

"Q. Did you know that he owned the building or that somebody else owned it?

"A. I didn't know."

Capsco is deemed to have knowledge of an agency relationship between Savageau and a principal by virtue of Savageau's position in a real estate brokerage office. *Ripani v. Liberty Loan Corp. of Carmichael,* 95 Cal.App.3d 603, 157 Cal.Rptr. 272 (1979). However, if Capsco did not know Shinnick's identity, Shinnick may be a par-

tially disclosed principal. A partially disclosed principal is generally defined and understood as one whose identity is wholly unknown to the third person at the time of the contracting. An undisclosed principal is one whose interest and position with reference to the agent, as well as his identity, was wholly unknown to the third person at the time of the contracting. 3 C.J.S. *Agency* § 412 (1973). For purposes of the agent's and principal's liability, the law relating to undisclosed and partially disclosed principals is the same for this case.

We have held that "the signature of a representative without any indication that he was signing in a representative capacity leaves him personally liable." *Farmers & Merch. Nat. Bank of Hatton v. Lee,* 333 N.W.2d 792, 794 (N.D.1983) *citing Ristvedt v. Nettum,* 311 N.W.2d 574, 578 (N.D. 1981); *Lake Grocery Co. v. Chiostri,* 34 N.D. 386, 158 N.W. 998 (1916). *See also* NDCC §§ 3–02–05(1), 3–04–02. Although the lease between Capsco and Shinnick did not involve signatures, this principle may be applicable to Savageau if Shinnick is a partially disclosed or undisclosed principal.

A New York Court has held that a vendor who deals in his own name, without disclosing the name of his principal, is personally bound by his contract, notwithstanding that he is known to the third party to be a broker who is usually employed in selling property as the agent of others. *Held v. Bryan L. Kennelly, Inc.,* 124 Misc. 547, 208 N.Y.S. 503 (N.Y.App. Term 1 1925). Even with regard to a partially disclosed principal, the same New York Court held that a broker could not escape liability for breach of contract on grounds that the purchaser knew that the broker was acting for a principal whose identity was not revealed—the person purporting to make a contract for a partially disclosed principal is a party to the contract. *Goodman Prods. Corp. v. A. Lustig, Inc.,* 265 A.D. 506, 39 N.Y.S.2d 660 (N.Y.App.Div. 1 1943). *See also Cooper v. Hileman,* 88 S.D. 516, 222 N.W.2d 299 (1974); *Special Sections, Inc. v. Rappaport Co.,* 25 A.D.2d 896, 269 N.Y.S.2d 319 (N.Y.App.Div. 3 1966); 12 C.J.S. *Brokers* § 103 (1980).

Conversely, we have held that the undisclosed or partially disclosed principal is likewise liable on the contract. *Lake Grocery, supra; Mitchell v. Knudtson Land Co.,* 19 N.D. 736, 124 N.W. 946, 950 (1910) ["the contract [may be] enforced against the principal even though he was undisclosed and unknown to the other party at the time of entering into the agreement . . ."].

Although the trial court properly held that an agency relationship existed, the trial court did not properly apply agency principles to the parties' relationship and rights and liabilities stemming therefrom. Assuming for purposes of the summary judgment motion that Savageau and Bianco are the agents of Shinnick for the purpose of leasing the building, the lease contract entered into with Capsco is valid. As a valid lease, Shinnick would be bound by the lease due to the ostensible authority granted in Shinnick. The trial court granted summary judgment against Capsco on the contractual claim on the assumption that Savageau and Bianco Realty are not parties to the contract. This may be error if Shinnick was a partially disclosed or undisclosed principal. If he was undisclosed, Savageau may be a party to the contract and liable for its breach.

When a trial court grants summary judgment, there must be no genuine issue of material fact or conflicting inferences which may be drawn from undisputed facts, or when only a question of law is involved. *United Elec. Serv. & Supply, Inc. v. Powers,* 464 N.W.2d 818 (N.D.1991). As there are factual issues yet to be resolved in this case with respect to Capsco's contractual claim, we reverse and remand to the trial court for this determination.

### Commercial Landlord's Duty to Disclose

The trial court ruled as a matter of law that the landlord did not have a duty to disclose a latent defect in the building because there were no personal injuries and the parties entered into a commercial lease as opposed to a residential one. The trial court based this ruling on *Bellemare, supra,* which involved a situation where Bellemare leased farmland from the landlord in 1979. Later in that year, Bellemare was injured when he fell from a ladder attached to a grain bin located on the leased land, and sued the landlord and others for breach of warranty, negligence, strict liability and negligent maintenance. The bin was sold to the landlord twelve years earlier. In discussing premises liability imposed upon a landlord, we held that:

"Generally, the common law imposes upon landlords no liability to their tenants or other entrants for injuries due to dangerous conditions on the leased premises. See, e.g., *Newman v. Sears, Roebuck & Co.,* 77 N.D. 466, 43 N.W.2d 411 (1950); Reporter's Note to Introductory Note to Chapter 17, *Restatement (2d) of Property* (1977); Comment *a Restatement (2d) of Torts,* § 356 (1965). The general rule of nonliability is subject to a number of exceptions. See, e.g., *Restatement (2d) of Property,* §§ 17.1–17.7 (1977); *Restatement (2d) of Torts,* §§ 357–362 (1965). See also, *Anderson v. Kroh,* 301 N.W.2d 359 (N.D.1981); *Francis v. Pic,* 226 N.W.2d 654 (N.D. 1975); *Huus v. Ringo,* 76 N.D. 763, 39 N.W.2d 505 (1949)."

*Bellemare, supra* at 740. We reaffirmed the general common-law rule of landlord nonliability (absent certain exceptions) notwithstanding the abandonment of the common-law categories of licensees and invitees.

In *Francis v. Pic,* 226 N.W.2d 654 (N.D. 1975), we were confronted with a situation wherein a social guest of a lessee brought an action against a landlord for injuries she sustained when she fell down a flight of steps in a rented one-family home. We cited with approval section 358 of the Restatement of the Law, Second, Torts, which reads:

"A lessor of land who conceals or fails to disclose to his lessee any condition, whether natural or artificial, which involves unreasonable risk of physical harm [1] to persons on the land, is subject to liability to the lessee and others upon

1. The phrase "physical harm" is defined in section 7 and explained in *Comment e* to section 7

the land with the consent of the lessee or his sublessee for physical harm caused by the condition after the lessee has taken possession, if

   .    .    .    .    .

(b) the lessor knows or has reason to know of the condition, and realizes or should realize the risk involved, and has reason to expect that the lessee will not discover the condition or realize the risk."

*Restatement (2d) of Torts* § 358 (1965) (footnote supplied).[2] We held in *Pic* that the general nonliability rule was not applicable when the landlord knew or had reason to know of a condition on the land at the time the lease was entered into which would involve a foreseeable and unreasonable risk of harm to persons where the nature of the condition is such that the landlord would have reason to expect that the lessee would not discover the defect or appreciate its risk. *Pic, supra.*

*Pic* and *Bellemare* are conceptually dissimilar to this case. The landlord in *Bellemare* made no representations to Bellemare regarding the safety of the ladder from which he fell. Likewise, the landlord in *Pic* made no representations as to the suitability of the stairway. In Capsco's case, Savageau, the landlord's leasing agent, made several affirmative representations to Capsco prior to Capsco entering into the lease. In his deposition, Savageau testified that:

    and *Comment b* to section 497, all of the Restatement of the Law, Second, Torts, and includes harm to property, as well as harm to the person. Capsco suffered harm to their property.

**2.** Conceptually similar to this section is section 17.1 of the Restatement of the Law, Second, Property (Landlord & Tenant) which reads:
    "A landlord who conceals or fails to disclose to his tenant any condition, whether natural or artificial, which involves unreasonable risk of physical harm to persons on the leased property and which exists when the tenant takes possession, is subject to liability to the tenant and others upon the leased property with the consent of the tenant or his subtenant for physical harm caused by the condition after the tenant has taken possession, if:

    .    .    .    .    .

    (b) the landlord knows or has reason to know of the condition, realizes or should realize the

"A. . . . He asked me, "Are the utilities on?" And I said, "No, they are not; they're off."

   .    .    .    .    .

"A. . . . He [Puklich] was well aware of the fact that there were not any utilities into the building, because I told him so.

"Q. And by "utilities" we're talking about heat, water and lights.

"A. That is correct."

Savageau responded affirmatively that "utilities" meant heat, water, and lights; and it is likely that Capsco attached the same definition to "utilities" for they are commonly defined as "something useful to the public, esp. the service of electric power, gas, water, telephone, etc." *Webster's New World Dictionary* 1565 (2d ed. 1980). Despite Savageau's representation that the water was off, the water to the fire sprinkler system was on.

■ A comment to section 358 of the Restatement of the Law, Second, Torts, states:

"Under the rule stated in this Section, a lessor of land who conceals a dangerous condition existing on land, having no reason to believe that the lessee will discover it, is subject to liability for physical harm caused thereby to the lessee and others on the land in his right. *It follows that the lessor is equally liable where by express words he represents*

    risk involved, and has reason to expect that the tenant will not discover the condition or realize the risk."
*Restatement (2d) of Property (Landlord & Tenant)* § 17.1 (1977). Within the meaning of the chapter in which this section is found, the phrase "physical harm" is defined in section 7(3) and explained in *Comment e* to section 7 and *Comment b* to section 497, all of the Restatement of the Law, Second, Torts, to include harm to property as well as harm to the person. Reporter's Note to Introductory Note to Part VI, *Restatement (2d) of Property (Landlord & Tenant)* (1977). Capsco suffered harm to property.

*the land to be safe knowing that it is not so.*

*Restatement (2d) Torts* § 358 cmt. (e) (1965) [emphasis added].[3] We earlier noted the conflicting testimony as to whether or not Savageau knew that the building was serviced by two water lines and whether Savageau knew that the water was still on. This was not addressed by the trial court.

Savageau and Bianco Realty contend that the above section from the Restatement of the Law, Second, Torts, is not applicable to this case as the section only applies to residential leases. We find no such support for this contention. Other jurisdictions have freely cited section 358 of the Restatement of the Law, Second, Torts, in commercial lease settings. *See Wilson v. Southland Optical Co., Inc.,* 774 S.W.2d 447 (Ky.Ct.App.1988); *Krance v. Faeh,* 215 Neb. 242, 338 N.W.2d 55 (1983); *Great Atl. & Pac. Tea Co., Inc. v. Wilson,* 408 N.E.2d 144 (Ind.Ct.App.1980); *Weaver v. Flock,* 43 Or.App. 505, 603 P.2d 1194 (1979); *Mezerkor v. Texaco Oil Co.,* 266 Cal.App.2d 76, 72 Cal.Rptr. 1 (1968); *Macomber v. Cox,* 249 Or. 61, 435 P.2d 462 (1967); *Reckert v. Roco Petroleum Corp.,* 411 S.W.2d 199 (Mo.1966).

■ Assuming for purposes of this motion, that Capsco was misled by Savageau's statement about the utilities, the trial court did not consider the ramifications of that misrepresentation. Therefore, there are factual and legal issues yet to be resolved in this case with respect to Capsco's tort claim.

Summary judgment regarding the tort and contractual claims against all parties is reversed and the case is remanded for further proceedings.

ERICKSTAD, C.J., and MESCHKE, LEVINE and JOHNSON, JJ., concur.

---

**3.** Section 17.1 *Comment e* of the Restatement of the Law, Second, Property (Landlord & Tenant), states essentially the same principle. Both section 358 of the Restatement of the Law, Second, Torts, and section 17.1 of the Restatement of the Law, Second, Property (Landlord & Tenant) were cited as exceptions we recognized to the general rule of landlord nonliability in *Bellemare v. Gateway Builders, Inc.,* 420 N.W.2d 733 (N.D.1988).