Virginia NENNINGER, Appellant,

v.

**TRUSTEES OF the ORAN LIFE TABERNACLE CHURCH, Respondents.**

No. 16355.

Missouri Court of Appeals,
Southern District,
Division One.

May 17, 1990.

Joseph P. Fuchs, Sikeston, for appellant.

Jeffrey S. Maguire, Thomasson, Dickerson, Gilbert & Cook, Cape Girardeau, for respondents.

CROW, Presiding Judge.

On July 12, 1988, Virginia Nenninger ("plaintiff") and her husband were tenants of an apartment in a duplex owned by the Trustees of the Oran Life Tabernacle Church ("defendants"). Plaintiff exited through the apartment's doorway, fell while descending the two outside steps to the ground, and sustained an injury, described *infra*.

Plaintiff sued defendants. Trial by jury produced a $67,000 verdict for plaintiff. The trial court subsequently granted defendants' motion for judgment notwithstanding the verdict and entered judgment for defendants on the ground that plaintiff failed to make a submissible case. Plaintiff appeals.

In determining whether the trial court was correct in entering judgment for defendants notwithstanding the verdict, we view the evidence in the light most favorable to plaintiff and give her the benefit of all reasonable inferences to be drawn therefrom. *Stark v. American Bakeries Co.*, 647 S.W.2d 119, 121[1] (Mo. banc 1983). Judgment for defendants is sustainable only if the evidence, so viewed, failed to make a submissible case for plaintiff. *Rhyne v. Thompson*, 284 S.W.2d 553, 556 (Mo.1955); *McCulley v. State Farm Mutual Automobile Insurance Co.*, 668 S.W.2d 121, 122[2] (Mo.App.1984); *Dockery v.*

*Mannisi*, 636 S.W.2d 372, 376[6] (Mo.App. 1982).

The accident occurred on a rainy afternoon. The doorway through which plaintiff stepped was her apartment's only means of ingress and egress. The outside steps did not serve the other apartment; it had its own separate entrance.

The steps were constructed of unpainted "one-inch thick rough-cut maple." Each was 39½ inches wide. One of the risers (apparently the one for the top step [1]) measured 8½ inches; the other riser measured 6½ inches. One of the steps (apparently the bottom one [2]) was 19½ inches deep; the other was 18½ inches deep. There was no handrail on either side.

There were two doors in the doorway. The outermost door was a "storm door" installed by plaintiff's husband. To a person exiting the apartment the storm door was hinged on the righthand side of the doorway.

Plaintiff, who had lived in the apartment since the summer of 1986, gave this account of the accident:

"As I was going out the door, I opened up the door, I stepped down. I slid on the step. I grabbed for a rail. There was nothing to grab to, so I grabbed with this hand and my ring got caught on the screen door handle, and as I fell out onto the ground, it just pulled my finger, not completely off, from here up.

Q As you went out the door, Virginia, which foot did you step down with?

A My left foot.

Q Where did you finally land?

A On the ground."

The finger referred to in plaintiff's testimony was the fourth (ring) finger of her right hand. The finger was torn off. Plaintiff is right-handed.

The last work done on the steps prior to plaintiff's accident was around 1981 when some of the boards were replaced.

---

1. In Plaintiff's Exhibit 5, a photograph of the steps, the height of the riser for the top step appears to exceed the height of the riser for the bottom step.

2. In Plaintiff's Exhibit 5 (footnote 1, *supra*) the bottom step appears to be the deeper of the two.

■ The general rule is that the landlord is not liable to the tenant for injuries caused by a dangerous condition, whether natural or artificial, which existed at the time the tenant took possession under the lease. *Reckert v. Roco Petroleum Corp.*, 411 S.W.2d 199, 205[5] (Mo.1966). This general rule is subject to an exception where at the time the lease is executed there is a dangerous condition of the premises involving unreasonable risk of physical harm to persons on the premises, which is known to the landlord and unknown to the tenant and not discoverable by the tenant in the exercise of ordinary care. *Id.* In such case there is a duty on the landlord to disclose to the tenant the existence of the dangerous condition and the landlord is liable to the tenant for injuries resulting from such condition if the landlord fails to disclose it to the tenant or conceals its presence from the tenant. *Id.* *See also: Knox v. Sands*, 421 S.W.2d 497, 500–01 (Mo. 1967).

■ Plaintiff did not contend in the trial court, nor does she here, that the alleged dangerous condition of the steps was unknown to her and was not discoverable by her in the exercise of ordinary care. Instead, plaintiff seeks to recover under the rule that a landlord is under a duty to exercise ordinary care to keep *the portions of the premises which he retains in his control* in a reasonably safe condition for the use intended and is liable for damages for personal injuries resulting from his failure to perform that duty. *Lemm v. Gould*, 425 S.W.2d 190, 194 (Mo.1968); *Peterson v. Brune*, 273 S.W.2d 278, 280[1] (Mo.1954).

Plaintiff's theory that defendants had retained possession and control over the steps was submitted to the jury by instruction 5, which read:

"Your verdict must be for plaintiff if you believe:

First, there was no handrail and as a result the stairway was not reasonably safe, and

Second, the stairway was in the possession and control of defendant and was used by tenants of defendant with its consent, and

Third, defendant knew, or by using ordinary care could have known, of this condition, and

Fourth, defendant failed to use ordinary care to make the stairway reasonably safe, and

Fifth, as a direct result of such failure, plaintiff was injured."

Instruction 5 was evidently based on MAI 22.05 [1981 Revision].

■ The possession or control that must be shown in order to make a landlord liable under the rule in *Lemm* and *Peterson* is not to be found merely in the obligation of the landlord to make repairs or the right to enter the premises. *Lemm*, 425 S.W.2d at 195[1]. There must be something more, some additional fact or facts from which a jury can infer that under the agreement the tenant gave up and surrendered his right to exclusive possession and control and yielded to the landlord some degree or measure of control and dominion over the premises, some substantial evidence of a sharing of control as between landlord and tenant. *Id.* To be bound to keep the premises in a reasonably safe condition the landlord need not have reserved such a degree of control as to be entitled to admit or exclude others from the premises; it is sufficient that he retained a general supervision over the premises for a limited purpose such as the making of repairs or alterations, and the right to enter the premises and make repairs upon his own initiative and responsibility. *Id.* at 195[2].

■ One method to prove retention of control is to show that the portion of the premises involved was so constructed as to be used by, or subject to be used by, the landlord and another tenant or by two or more tenants. *Peterson*, 273 S.W.2d at 281. The ultimate question is whether the landlord did retain control of the particular portion of the premises under consideration. *Id.* This is because the foundation of the landlord's duty is based upon his retention of control. *Id.*

■ In the instant case it was undisputed that the steps on which plaintiff fell

were not used by the tenants of the other apartment in the duplex; that apartment had its own entrance. The steps provided access to only plaintiff's apartment. Plaintiff insists, however, that the evidence was sufficient to raise a submissible issue as to whether defendants retained sufficient control over the steps to obligate defendants *to maintain the steps in a reasonably safe* condition. Plaintiff relies on the following evidence.

The building in which plaintiff's apartment was located was originally used as a church. In 1981 it was converted to a duplex "by various men of the church." Jimmy D. Mahurin, pastor of the church, answered certain interrogatories propounded by plaintiff to defendants. One interrogatory asked defendants to indicate "who was responsible for the maintenance of the premises at the time plaintiff fell." Mahurin answered, "The men of the church."

Plaintiff testified her "rental arrangement" with defendants was "[j]ust pay rent once a month." Plaintiff's testimony continued:

"Q What other obligations did you have regarding the property?

A None.

Q Who was responsible for maintaining and repairing the property?

A The church.

Q When something needed fixing, who did you contact, Virginia?

A Sometimes Ms. Abner, she went to the church, but someone from the church, Mr. Mahurin.

Q When you would do that, would someone from the church come out and attempt to repair whatever it was that needed repairing?

A Yes, sir.

Q Under your rental arrangement with the church, were you to repair or keep up anything?

A No, sir."

Plaintiff recounted that during her occupancy the hot water heater, the cookstove, and the furnace had needed repairing. She reported the problems to Mahurin. The three items were fixed. Plaintiff also reported to Mahurin that the carpets were "molding"; however, they were never replaced so she and her husband cleaned them. As noted earlier, plaintiff's husband replaced the storm door. Plaintiff and her husband had no place to park their car. Mahurin had some gravel delivered, which was dumped close to the steps. Plaintiff and her husband spread the gravel. Mahurin painted the exterior of plaintiff's apartment "around the fall of 1987" and trimmed the trees.

Plaintiff's husband testified he talked with Mahurin about painting the interior of the apartment. Plaintiff's husband quoted Mahurin as saying he "didn't really have time to do it." Plaintiff subsequently obtained permission for her and her husband to paint the interior and they did.

According to plaintiff's husband, Mahurin said in the fall of 1987 that he "was going to try to replace the steps."

Mahurin denied any conversation regarding the steps. Mahurin's cross-examination by plaintiff's lawyer did, however, produce this:

"Q During the time you rented this small apartment, Mr. Mahurin, did you ever ask any tenant's permission to do any maintenance or upkeep?

A No, sir.

Q So, then, if you wanted to replace the steps, you would just do that, wouldn't you?

A Yes, sir.

Q And if you wanted to put up a handrail, you would have just done that, wouldn't you?

A Yes, sir.

. . . .

Q As a matter of fact, you did just that in the painting and in the gravel and in the limbs and everything else that you did around that property, didn't you?

A Yes, sir."

In addition to the foregoing evidence plaintiff asserts Mahurin "inspected" the premises "periodically." We have examined those portions of the transcript cited by plaintiff in support of that proclamation.

**534**

In our opinion, plaintiff has overstated the evidence. The testimony cited by plaintiff was (1) the conversation between her husband and Mahurin mentioned earlier in this opinion, (2) an excerpt from Mahurin's deposition in which he stated he had inspected the steps more than once between 1981 and 1988, (3) an admission by Mahurin that he had been in and out of the apartment door a dozen or more times, (4) an answer by Mahurin on cross-examination that he had had occasion to go by and inspect the apartment while the Nenningers were home, (5) Mahurin's testimony that he had entered the apartment at the Nenningers' request to inspect the stove, the furnace, and the carpet, and (6) Mahurin's testimony that he observed the steps on the occasions when he was in and out of the apartment.

The testimony of plaintiff's husband, however, included this:

"Q  Was anyone from the church in the apartment to do any inspections or anything that you know of?

A  No, sir.

. . . .

Q  Now, you said, I believe, that no one from the church ever made any kind of inspection inside the apartment; is that right?

A  No, not that I'm aware of."

Plaintiff also asserts "[t]he landlord repaired and replaced the roof." That declaration is flatly refuted by the record. Plaintiff's husband testified he and Mahurin "talked about the roof," but plaintiff's husband admitted it was not leaking and was never replaced.

Mahurin testified that during the time the Nenningers rented the apartment he did not retain a key to it. That testimony was uncontradicted.

Plaintiff relies on six cases in support of her contention that the evidence was sufficient to raise a submissible issue as to whether defendants retained sufficient control over the steps to obligate defendants to maintain the steps in a reasonably safe condition. The earliest of the six is *Peterson*, 273 S.W.2d 278.

In *Peterson* the plaintiff was injured when he fell from the front porch of his rented flat because of an allegedly defective banister. The plaintiff and the tenants of another flat used the porch and the lone set of steps to it to reach the front entrances of their respective flats. Pointing out that one method to prove retention of control by the landlord is to show that the portion of the premises involved was so constructed as to be used by two or more tenants, the Supreme Court of Missouri rejected the landlord's contention that the trial court should have directed a verdict against the plaintiff at the close of the evidence. 273 S.W.2d at 281.

In the instant case the steps on which plaintiff fell served only her apartment, consequently they were not a "common" area like the porch in *Peterson*.

The second case relied on by plaintiff is *Tucker v. Taksel*, 345 S.W.2d 385 (Mo.App. 1961). There a 13–year–old son of the tenants of an apartment was playing inside and attempted to brace himself by grasping a window sill. The sill broke loose and fell outward to the ground, as did the child. The child sued the landlord on the theory that the landlord had retained partial control of the apartment for the purpose of making repairs and had negligently failed to repair the sill. The apartment was one of six in the building. It was rented furnished. All utilities were included in the weekly rent. The resident manager retained a duplicate key to the apartment, which she occasionally used for entry for such purposes as decorating, replacing fuses, and turning off plumbing. The landlord made all repairs inside and outside the building, of furniture, plaster, plumbing, porches, windows and "anything else." *Id.* at 387. On appeal by the landlord from a judgment in favor of the child, the appellate court held that reasonable minds might well conclude that the landlord retained the right to control the apartment for the purpose of making repairs in general and the window sill in particular, hence the child was entitled to go to the jury on the issue of the landlord's right of control. *Id.* at 388.

The third case relied on by plaintiff is *Lemm,* 425 S.W.2d 190. There a three-year-old child climbed through an opening between a baluster and a column on the porch of a fourth-floor apartment occupied by his parents, fell to the ground, and was injured. The child and his parents sued the landlord on the theory that the landlord had retained control of the porch for the purpose of making repairs and was consequently required to exercise ordinary care to keep it in a reasonably safe condition. The building contained eight apartments. The tenants paid rent weekly, which included furniture, all utilities and all repairs. The resident manager kept a key to the apartment. During the 15 months that the family had lived there the landlord had replaced a broken window, repaired rat holes under the kitchen sink, replaced a couch that was worn, sprayed bug powder around the baseboard and crevices, and installed wire screening on the porch (above the place where the child slipped out). Some of the work had been done while the family was away. The landlord used his key to gain entry without notifying the tenants. On appeal by the landlord from a judgment in favor of the child and his parents, the appellate court held that the evidence was sufficient for the jury to find that the landlord had retained general supervision over the premises for the purpose of making repairs or alterations and the right to enter the premises to do so upon his own initiative and responsibility. *Id.* at 195.

The fourth case relied on by plaintiff is *Woods v. Gould,* 515 S.W.2d 592 (Mo.App. 1968). There a two-year-old child was injured when she fell from the porch of a second floor apartment occupied by her parents. The building had three floors; each floor contained two apartments. There was a janitor's quarters in the basement. On each floor there was a porch common to the apartments on that floor. Stairways ran through the porches. The child, unbeknownst to her mother, evidently crawled from inside the apartment onto the porch by pushing open a screen door with a defective latch, then slipped between the railings around the porch. The child's

parents had rented the apartment weekly. It was a furnished apartment and the rent included all utilities. The parents testified that the landlord, at the time of renting, promised to repair the screen door. The landlord testified she would make any repairs in the apartment whenever needed. There was, however, no evidence that the landlord retained a key to the apartment or in any other way reserved any control or right to enter it.

The child's theory of recovery was that the landlord was negligent in (1) failing to repair the screen door as promised, and (2) failing to maintain the common porch in a reasonably safe condition for children such as her. The appellate court held that even though the jury could find a promise by the landlord, supported by consideration, to repair the screen door, there was "not one iota of evidence that [the landlord] retained control over the apartment." *Id.* at 595–96. Absent such control by the landlord, said the court, no cause of action arises in tort for negligent breach of such promise to repair. *Id.* at 596. Therefore, held the court, there was insufficient evidence to support a submission of landlord negligence in failing to repair the screen door. *Id.*

As to liability for failure to maintain the porch in a reasonably safe condition for children, the court in *Woods* noted that the porch was used by the tenants of both apartments on the second floor as a means of reaching the stairway which led to the ground and up to the floor above. Thus, said the court, there could be no dispute that the porch was intended for and in fact used in common by two or more tenants, and under the law it remained in the control of the landlord. *Id.* at 596[3]. Therefore, held the court, the landlord had a duty to maintain the porch in a condition reasonably safe for the use to be made thereof, and if she negligently failed to do so she was liable in tort to those injured because of such negligence who were rightfully upon the premises. *Id.* at 596[4]. As the landlord admitted knowing the tenants had small children, an injury such as sustained in *Woods* could reasonably be fore-

seen. *Id.* at 596. Accordingly, the evidence made a submissible case as to the negligence of the landlord in maintaining the porch railings with openings through which a child could easily fall. *Id.* at 597.

The fifth case relied on by plaintiff is *Van Doren v. Cook,* 672 S.W.2d 724 (Mo. App.1984). There the landlord had employed a man to repair the steps to the porch of the tenant's apartment. While the repairs were under way the tenant attempted to descend the steps and fell when the unsecured top step separated from the porch. The Eastern District of this Court held:

"In areas which are not designated by contract or by definition as common areas under a landlord's control, but are areas that a landlord has undertaken to repair voluntarily or by consent, the landlord must exercise reasonable care in undertaking repairs and is liable for injury caused by negligence or unskillfulness in repairing or in leaving the premises in an unsafe condition. (Citation omitted.) Here, the record indicates that the defendant voluntarily initiated repairs. By so doing, she assumed control of the area." *Id.* at 726[1, 2].

*Van Doren* is patently inapplicable to the instant case as no repairs were being made to the steps at the time plaintiff fell. As noted earlier in this opinion, the last work done on the steps prior to plaintiff's accident was around 1981.

The final case relied on by plaintiff is *Hitchell v. Strauss,* 748 S.W.2d 771 (Mo. App.1988). There, while one of the tenants was gone for the summer, the landlord changed the frequency of the residents' garage door opening devices because an opener had been stolen. The apartment manager slipped a note under each apartment door notifying the occupant about the change. Several weeks later the absent tenant returned, driving directly to the garage. After attempting unsuccessfully to open the garage door the tenant parked, exited his automobile, and started walking toward a side door of the apartment building. He tripped over a metal post stump in the public sidewalk easement in front of

the building and was injured. The tenant sued the landlord and the municipality. Liability against the landlord was predicated on the theory that the landlord was negligent in failing to notify the tenant of the change in the door opener, thereby placing the tenant in a position to encounter the negligently maintained post stump on public property. The trial court sustained the landlord's motion for directed verdict at the close of the evidence. On appeal by the tenant, that ruling was upheld. We fail to see how *Hitchell* supports plaintiff in the instant case.

By now it should have become evident that the instant case is unlike any of the six on which plaintiff relies. *Peterson,* as noted earlier, involved a porch used by the tenants of two flats. *Tucker* involved one apartment in a six-apartment building with a resident manager who retained a key to the injured party's apartment, the arrangement being that the landlord made all repairs and the manager occasionally entered the apartment to decorate, replace fuses and turn off plumbing. *Lemm* involved an apartment in an eight-apartment building with a resident manager who retained a key to the injured party's apartment, the arrangement being that the landlord supplied all furniture and made all repairs, some such work being done while the tenants were gone and without notifying them. *Woods* involved a second-floor porch used by tenants of the two apartments on that floor, the building containing six apartments in all. While the opinion in *Woods* held that the porch (being a common area) remained in the landlord's control, the opinion stated the evidence failed to support a jury submission that the landlord retained control over the screen door *that served only the injured party's apartment.* In *Woods,* it will be recalled, there was no evidence that the landlord retained a key to the apartment or in any other way reserved any control or right to enter it. *Van Doren* and *Hitchell* do not aid plaintiff for the reasons set forth earlier in our discussion of those cases.

The instant case is analogous to *Wingo v. Eagle Realty Co.,* 726 S.W.2d 805 (Mo.

App.1987). There a guest of the tenants of a second floor apartment was injured when she fell from the apartment's porch. She sued the landlord on the theory of negligence in failing to repair a "common" porch. The undisputed record showed that while the porch extended across the back of the apartment building and served both apartments on the second floor, it was divided by a wall so that the occupants of each apartment could reach their respective sections of the porch only by going through their respective apartments. The trial court granted summary judgment for the landlord on the ground that the porch was a non-common area over which the landlord had no duty to repair or warn. *Id.* at 806. On appeal by the guest the Eastern District of this Court affirmed, holding that a landlord is not ordinarily liable for injuries resulting from a defective condition in part of the premises not reserved by the landlord for common use of two or more tenants, but which are demised to a particular tenant. *Id.* at 807.

In the instant case there was uncontradicted evidence that defendants retained no key to plaintiff's apartment. There was no evidence that defendants ever entered plaintiff's apartment to make repairs without being asked by plaintiff. While defendants supplied gravel for the parking area, plaintiff and her husband spread it. When defendants failed to paint the interior of the apartment, plaintiff and her husband painted it. Plaintiff's husband installed the storm door. While Mahurin admitted on cross-examination that he had had occasion to go by and inspect the apartment while the Nenningers were home, he did not say he entered the apartment or that if he did enter he did so without permission.

The fact that defendants repaired the hot water heater, cookstove and furnace, painted the exterior of the apartment and trimmed the trees does not establish that defendants exercised any degree of control and dominion over the apartment or the steps on which plaintiff fell. As explained in *Lemm*, the possession or control that must be shown in order to make a landlord liable for an injury resulting from failure to keep the premises in a reasonably safe condition is not to be found merely in the obligation of the landlord to make repairs or the right to enter the premises. 425 S.W.2d at 195[1]. There must be something more, some additional fact from which a jury can infer that under the agreement the tenant gave up and surrendered his right to exclusive possession and control and yielded to the landlord some degree or measure of control and dominion over the premises, some substantial evidence of a sharing of control between landlord and tenant. *Id.*

No such evidence exists in the instant case. There was no resident manager, no retention of a key by defendants, and no instance where defendants ever entered the apartment to make repairs without being asked by plaintiff or her husband. Indeed, in a discussion between counsel and the trial court at the close of plaintiff's evidence about whether plaintiff had made a submissible case, the trial court asked plaintiff's lawyer, "Give me one case where [Mahurin] gratuitously or on his own volition exercised any dominion without [the Nenningers'] permission over any of the premises leased." Plaintiff's lawyer replied, "There isn't any evidence of that, and I don't think it's necessary."

We hold that the evidence was insufficient to make a submissible jury issue as to whether defendants retained control of plaintiff's apartment and particularly the steps on which she fell. That being so we need not consider whether the evidence was sufficient to make a submissible jury issue on whether the failure to install a handrail was negligence.

Judgment affirmed.

PREWITT and PARRISH, JJ., concur.