Dale E. LEWIS, Appellant,

v.

B. Joseph BIEGEL (Deceased) and Mary Biegel; Biegel Refrigeration and Electric Co., Inc., Respondents.

No. WD 66435.

Missouri Court of Appeals, Western District.

Oct. 31, 2006.

John H. Norton, Kathryn S. Perkins, Co–Counsel, Kansas City, MO, for appellant.

William T. Session, Darwin E. Johnson, Co–Counsel, Kansas City, MO, for respondents B. Joseph and Mary Biegel.

Richard S. Wade, Columbia, MO, for respondent Biegel Refrigeration and Electric Co., Inc.

Before JOSEPH M. ELLIS, Presiding Judge, ROBERT G. ULRICH, Judge and RONALD R. HOLLIGER, Judge.

JOSEPH M. ELLIS, Judge.

Dale E. Lewis ("Dale") appeals an adverse summary judgment entered by the Circuit Court of Linn County on his First Amended Petition for Damages, which sought recovery for personal injuries suffered by Dale when an elevator he was operating failed. The judgment of the trial court is affirmed in part, reversed in part, and remanded for further proceedings.

## I.

Our review of the grant of summary judgment was stated in *Bannum, Inc. v. City of St. Louis*, 195 S.W.3d 541, 544 (Mo.App. E.D.2006) (internal citations and original paragraph style omitted):

We review a grant of summary judgment de novo. The record below is reviewed in the light most favorable to the party against whom summary judgment was entered, and that party is entitled to the benefit of all reasonable inferences from the record. Summary judgment is appropriate only when the record demonstrates that there are no genuine disputes regarding material facts and that the moving party is entitled to judgment as a matter of law. The movant bears the burden of establishing both a legal right to judgment and the absence of any genuine issue material fact required to support the claimed right to judgment.

A "material fact" is a fact of such significance or probative value as to control or determine the outcome of the litigation. *Auto–Owners Mut. Ins. Co., Inc. v. Newman,* 851 S.W.2d 22, 25 (Mo.App. W.D. 1993); *Karney v. Wohl,* 785 S.W.2d 630, 632 (Mo.App. E.D.1990). "[I]f the record contains competent evidence that two plausible, but contradictory accounts of essential facts exist, then a genuine issue of material fact remains to be resolved, because fair minded people, exercising reasonable judgment could reach different conclusions on the issue in controversy." *Larison v. Pub. Water Supply Dist. # 1,* 998 S.W.2d 192, 196 (Mo.App. W.D.1999). Thus, "disputes over facts that might affect the outcome of a suit under governing law preclude the entry of summary judgment. The determination of such contradictory facts is for the fact finder at a complete trial." *Payne v. City of Osage Beach,* 132 S.W.3d 314, 317 (Mo.App. S.D. 2004).

## II.

Viewed in the light most favorable to Dale (who, as noted *supra,* was the party against whom summary judgment was entered) and giving him the benefit of all reasonable inferences therefrom, the record shows the following. Biegel Refrigeration and Electric Co., Inc. ("Biegel Refrigeration") was incorporated by B. Joseph Biegel ("Joe") and his wife Mary Biegel ("Mary") on January 9, 1968. At this time, both the business and a building located at 109 South Main in Brookfield, Missouri, were owned by Joe and Mary, who had originally acquired the building in 1957 and conducted their business operations in it. They continued to own and operate Biegel Refrigeration until they sold it to a holding company owned by Leslie Eggerman ("Les") and his wife Jean Eggerman ("Jean") on April 1, 1984. At this time, Les became the president of Biegel Refrigeration and Jean became the company's secretary. Thereafter, the Eggermans continued to own and operate the business under the name of Biegel Refrigeration.

However, Joe and Mary retained their ownership of the building at 109 South Main in Brookfield, inside which is the elevator Dale was riding when he was injured. On or about February 14, 1984, Mary executed a quit-claim deed transferring all of her right, title, and interest in the building to her husband Joe, which was duly recorded in the public real estate records of Linn County on February 17, 1984. On April 1, 1984, Joe (as lessor) and Biegel Refrigeration (as lessee) entered into a written lease for use of the building by Biegel Refrigeration. Although the original written lease was for a five-year term running from April 1, 1984, to March 31, 1989, the lease was subsequently renewed for two additional consecutive five-year terms through March 31, 1999, and was in effect at the time Dale was injured.

Sometime between 1975 and 1980, Joe and another person, Walter Sights ("Walt," who is now deceased), made alterations to the lifting and lowering mecha-

nism on the elevator Dale was riding when he was injured. Prior to these alterations, the elevator had a belt-driven rack and pinion hoisting mechanism which controlled a moving wooden platform without a top or sides that ascended and descended between a set of vertical wooden guide rails. Joe and Walt replaced the elevator's original hoisting system with an electric chain hoist mechanism and added two spring-loaded hand switches to control the elevator's movement—one inside the elevator itself and the other on the ground floor of the building. While making these alterations to the original elevator, Joe and Walt also disconnected and partially removed portions of the elevator's original emergency brake system since it was incompatible with the electric chain hoist mechanism they had installed.[1] This emergency brake system consisted of a "failsafe" mechanically-operated jaw-like device which was designed to engage the guide rails and cause the elevator to stop should the hoisting mechanism fail.

At no time prior to entering into the written lease did Joe, Mary, or anyone else inform the Eggermans that Joe and Walt had disengaged the elevator's emergency brake system when they made the separate alterations to the lifting and lowering mechanism on the elevator sometime between 1975 and 1980, or even that Joe and Walt had performed elevator alterations of any kind. To the contrary, neither Les nor Jean ever had any communication with Joe or Mary concerning the elevator's safety prior to Dale's accident. Moreover,

they were not trained in and had no specialized knowledge regarding the mechanics of elevator operation, mechanics, or safety.

In the fall or winter of 1997, the elevator became stuck between the first and second floors of the building. The elevator had two passengers in it (Jean and another individual, Dennis Fletcher) at the time, both of whom managed to get off the elevator just before it fell to the building's basement, destroying the wooden platform on which they had been standing. The reason the elevator failed was that a metal piece called a "spline" located within the chain hoist mechanism previously installed by Joe and Walt, which constituted the mechanical means by which a steel shaft was secured to gears within the hoist system, had physically sheared off.

After this incident, the broken spline and the wooden platform were repaired or replaced. The parties introduced into the summary judgment record conflicting evidence as to what other actions may have been undertaken once those repairs were completed. According to Ted Thudium ("Ted"), who was also an employee of Biegel Refrigeration, once the broken spline and wooden platform had been replaced, Jean asked him to install, in his spare time, "some kind of a safety system" to stop the elevator if it were ever to fall again, but he never completed the work before abandoning the project some two months later due to the press of his other job responsibilities. In his deposition, Ted

---

1. Several organizations, including Building Official and Code Administrators International, Inc. (BOCA) and the American Society of Mechanical Engineers (ASME), have published standards for the design, construction, installation, and alteration of new and existing elevators. Among many other things, these standards require that all existing elevators have a mechanically applied car safety system capable of stopping and sustaining the car with its full load from governor tripping speed. They also require that all existing elevators be suspended by not less than two steel wire ropes attached to the car frame or passing around sheaves attached to the car frame. Although they had not yet been officially adopted by the City of Brookfield when Joe and Walt made the alterations to the elevator, they were in existence at the time the alterations were made.

also indicated that it would not have been obvious to anyone using the elevator that his repair work was incomplete, that he didn't know and couldn't say if the elevator's original emergency brake system had been disconnected, and that he never discussed the status or incompleteness of his elevator brake work with Dale.

However, in their depositions both Les and Jean testified that, to the best of their recollection, neither one of them ever instructed Ted or any other employee of Biegel Refrigeration to make repairs to the elevator's emergency braking system or to try to hook up a new brake system on the elevator prior to Dale's accident. Moreover, Jean also indicated that until the time of her deposition, she was never even aware "that there had been an elevator system with a safety brake system designed that had been disconnected." Meanwhile, Dale continued using the elevator since it was the only means of ingress and egress to the second floor of the building,[2] which he had to be able to access in order for him to perform the tasks associated with his employment at Biegel Refrigeration.

On October 8, 1998, while acting in the course and scope of his employment with Biegel Refrigeration, Dale was riding in the elevator on the second floor of the building, as he did some four to six times a day. Shortly after he engaged the hand switch to go down, the elevator failed for a second time and fell to the first floor of the building (a distance of approximately thirteen feet), causing him to suffer personal injuries. The reason the elevator failed this time was that the load chain previously attached to the top or crosshead of the elevator by Joe and Walter broke. Fortunately for Dale, the elevator did not fall all the way down to the basement as it had the first time because he had previously placed several wooden 2–by–12 planks in the elevator shaft at the first-floor level to make it easier and safer for him to perform repairs on the broken wooden platform after the 1997 incident.

As demonstrated by his report and the accompanying affidavit, the opinion of Dale's expert witness, Joseph L. Stabler of Stabler Associates, Inc., was that Dale's injuries were caused by "the physical modification of the subject elevator ... as performed by" Joe, which included "the installation of improper hoisting equipment, followed by 'jerry-rigging' and partial removal of the car safety system," all of which "made the elevator hazardous and untrustworthy." In particular, Stabler, who has some thirty years of experience in the elevator industry, concluded that Joe's "unauthorized and unorthodox alteration of the subject elevator which included the installation of an electric chain hoist (non-elevator equipment) and removal of the car safety system followed by the failure to subsequently install or otherwise equip the elevator with a car safety system, directly caused or contributed to cause Plaintiff Dale Lewis' injuries." Stabler further opined that although Joe had "permanently compromised the integrity of the elevator and its hoisting system," a "lay person would not possess the necessary skills to diagnose the condition of the elevator and its car safety system, nor would they be able to fully appreciate the function and operation of the car safety system."

Dale filed his original Petition for Damages against Joe and Mary on April 21, 2003. After they had filed their answer, Joe died, and on September 16, 2003, the trial court entered an order appointing Terry Tschannen as the defendant ad litem for Joe. On November 2, 2004, the trial court granted leave to Terry Tschan-

---

2. There are no stairs leading to the second floor of the building.

nen to withdraw as defendant ad litem for Joe and ordered Mary (who had been married to Joe for more than sixty years at the time of his death) to serve in that capacity, thus making Mary both an individual defendant and the defendant ad litem for Joe. After requesting and being granted leave to do so, these defendants, as third party plaintiffs, filed their third party petition against third party defendant Biegel Refrigeration on March 10, 2005. Dale subsequently requested and was granted leave to file his First Amended Petition for Damages against Mary and the defendant ad litem for Joe, who filed their answer on August 8, 2005.[3] On September 8, 2005, Mary and the defendant ad litem for Joe filed their "Motion for Summary Judgment on Plaintiff's First Amended Petition for Damages or in the Alternative Partial Summary Judgment for Separate Defendant Mary Biegel." On December 8, 2005, the trial court entered summary judgment in favor of Mary and the defendant ad litem for Joe on both counts of Dale's First Amended Petition for Damages.[4] Dale filed his "Motion to Reconsider Grant of Summary Judgment in Favor of Defendant" on December 28, 2005, and on January 6, 2006, after making an express determination that "there is no just reason for delay," the trial court entered orders overruling the motion to reconsider and designating the summary judgment as final for purposes of appeal pursuant to Rule 74.01(b). This appeal followed.

### III.

Dale advances four points on appeal, which we will address out of their original order. In his second point, Dale contends the trial court erred in entering summary judgment in favor of the defendant ad litem for Joe on Count I of Dale's First Amended Petition for Damages because the court misapplied the law in ruling, as a matter of law on the record before it, that the owner and lessor of the building (Joe) was not liable to Dale since the lessee (Biegel Refrigeration) had a reasonable opportunity to discover the dangerous condition of the elevator and to take precautions to remedy it in that the record contains conflicting evidence as to that material issue, thereby precluding summary judgment. We agree.

 In granting summary judgment to the defendant ad litem for Joe on Count I of the petition, the trial court recognized the general rule that when exclusive possession of leased premises rests in the tenant, the landlord will not be liable for injuries to the tenant or his invitees resulting from dangerous conditions therein, whether they existed at the time the tenant took possession under the lease or thereafter came into existence. *See Warner v. Fry*, 360 Mo. 496, 228 S.W.2d 729, 730 (1950); *Nenninger v. Trustees of Oran Life Tabernacle Church*, 789 S.W.2d 530, 532 (Mo.App. S.D.1990). The trial court also properly acknowledged that "[t]his general rule is subject to an exception where at the time the lease is executed there is a dangerous condition of the premises involving unreasonable risk of physical harm to persons on the premises, which is known to the landlord and unknown to the tenant and not discoverable by the tenant in the exercise of ordinary

---

**3.** Count I of Dale's First Amended Petition for Damages pled common law negligence, while Count II pled negligence per se arising from Joe's alleged violations of Ordinance 90–20, a municipal elevator safety ordinance enacted by the City of Brookfield in October 1990.

**4.** Dale has not appealed the trial court's entry of summary judgment in favor of Mary on both counts of his First Amended Petition for Damages and in favor of the defendant ad litem for Joe on the second count of the petition.

care." *Nenninger*, 789 S.W.2d at 532. "In such case there is a duty on the landlord to disclose to the tenant the existence of the dangerous condition and the landlord is liable to the tenant for injuries resulting from such condition if the landlord fails to disclose it to the tenant or conceals its presence from the tenant." *Id.* The trial court further correctly noted that as long as there is "no contention of active concealment of a condition known to the [landlord]," the landlord's liability under this exception "continues only until the lessee has had reasonable opportunity to discover the condition and to take precautions to remedy it." *See id.* Applying these legal principles to the summary judgment record, the trial court ruled that Joe could not be held liable because "it is not plausible to suggest that the lessee ... had not had 'a reasonable opportunity to discover the condition and take precautions to remedy it' as of October 8, 1998, the date of the elevator failure resulting in [Dale's] injuries." The court based this ruling on two facts, the first of which was that the tenants (Les and Jean Eggerman) "had been in possession of the premises since April 1984," which was "more than fourteen years prior to the accident." From this, the trial court evidently drew the inference that fourteen years was a sufficiently long enough period for the Eggermans to have had a reasonable opportunity to discover and remedy the dangerous condition of the elevator, which Joe did not disclose to them even though he created and was aware of the elevator's dangerous condition.[5]

This was error, because under the circumstances here, the fact that the Eggermans had been tenants in exclusive posses-sion of the building for the fourteen years preceding the events of October 8, 1998, is of no bearing on the decisive legal issue of whether the undisclosed dangerous condition exception to the general rule of landlord non-liability was applicable. As noted in the statement of facts *supra*, Dale introduced into the summary judgment record evidence that: (1) the Eggermans were not trained in and had no specialized knowledge regarding the mechanics of elevator operation, mechanics, or safety; (2) that a lay person would not have the necessary skills to properly diagnose the condition of the elevator and its car safety system nor would they be able to fully appreciate the function and operation of the car safety system; and (3) that neither Les nor Jean ever had any communication with Joe or Mary concerning the elevator's safety prior to Dale's accident. Therefore, the Eggermans could have exercised ordinary care while being in exclusive, continuous possession of the building for *several decades* prior to Dale's October 8, 1998 accident and still not have known or had reason to know that the elevator ever even *had* a failsafe emergency brake system to begin with, not to mention that Joe had actually disconnected and partially removed portions of that system before they leased the building from him.

Based on this essentially uncontradicted evidence, a reasonable juror could determine that, given the latent nature of the dangerous condition involved here, the Eggermans did not have a reasonable opportunity to discover and remedy the defect despite the passage of fourteen years. Instead of leaving this determination for the jury, however, the trial court impermissi-

---

5. The parties do not dispute that neither Joe nor Mary informed the Eggermans that Joe and Walt had disabled and partially removed the elevator's emergency brake system. Nor is it disputed that Joe and Mary failed to disclose the dangerous condition of the elevator before or after the Eggermans purchased Biegel Refrigeration and entered into the written lease for the building.

bly substituted its own judgment and made a determination that it believed fourteen years to be sufficient as a matter of law based on an adverse inference that was both unwarranted and unauthorized on the summary judgment record before the court.

The second purportedly undisputed material fact upon which the trial court based its ruling that Joe could not be held liable was that "the elevator in question experienced a serious failure in fall or winter of 1997, after which the tenants undertook incomplete and insufficient repairs before placing the elevator back in service." However, in coming to this conclusion, concerning which the trial court stated there was "no genuine issue of material fact," the trial court overlooked a wealth of conflicting evidence bearing directly on the issue of what other actions may have been undertaken after the spline was replaced and the wooden platform was repaired.

While there had been a previous incident with the elevator in the fall or winter of 1997, it occurred when the spline inside the chain hoisting mechanism installed by Joe physically sheared off. After the spline was replaced and the wooden platform was repaired, the Eggermans then returned the elevator to service. Meanwhile, the record is devoid of any evidence that these particular repairs had anything to do with the October 8, 1998 incident, which occurred when the load chain Joe and Walter had previously attached to the elevator's crosshead some twenty years earlier broke, or that they were otherwise "incomplete and insufficient."

Moreover, the trial court's judgment shows that in reaching its conclusion that the Eggermans "undertook incomplete and insufficient repairs before placing the elevator back in service" after the 1997 incident, it accepted as true Ted's deposition testimony that once the broken spline and wooden platform had been replaced, Jean asked him to install, in his spare time, "some kind of a safety system" to stop the elevator if it were ever to fall again, but he never completed the work before abandoning the project some two months later due to the press of his other job responsibilities. However, as we have already observed, in their depositions both Les and Jean testified that, to the best of their recollection, neither one of them ever instructed Ted or any other employee of Biegel Refrigeration to make repairs to the elevator's emergency braking system or to try to hook up a new brake system on the elevator prior to Dale's accident. Likewise, Jean also indicated that until the time of her deposition, she was never even aware "that there had been an elevator system with a safety brake system designed that had been disconnected." Furthermore, Ted also indicated that it would not have been obvious to anyone using the elevator that his repair work was incomplete, that he didn't know and couldn't say if the elevator's original emergency brake system had been disconnected, and that he never discussed the status or incompleteness of his elevator brake work with Dale.

Because the summary judgment record contains competent evidence that two plausible but contradictory accounts of essential facts exist, a genuine issue of material fact remains to be resolved, *Larison*, 998 S.W.2d at 196, which necessitates a complete trial and precludes the entry of summary judgment, *Payne*, 132 S.W.3d at 317. In short, it is for a jury to resolve, after a complete trial, the factual question of whether the Eggermans had a reasonable opportunity to discover and remedy the dangerous condition of the elevator's emergency braking mechanism originally created by Joe and Walt but not disclosed by them. Accordingly, the trial court erred in ruling, as a matter of law on the record

before it, that Joe was not liable to Dale since the Eggermans had a reasonable opportunity to discover the dangerous condition of the elevator and to take precautions to remedy it. Point granted.

In his third point, Dale contends the trial court erred in entering summary judgment in favor of the defendant ad litem for Joe on Count I of Dale's First Amended Petition for Damages because the court misapplied the law in ruling, as a matter of law on the record before it, that Joe was not liable to Dale since the Eggermans' decision to place the elevator back into service after the 1997 incident without first making adequate repairs was a superceding cause of Dale's personal injuries.

In granting summary judgment to the defendant ad litem for Joe on Count I of the petition, the trial court recognized the general rule that "[w]here exclusive possession rests in the tenant, the landlord is liable for injuries resulting from defects caused by his active negligence in making repairs—either under covenant to do so or by voluntarily undertaking such repairs." *Grimmeissen v. Walgreen Drug Stores,* 229 S.W.2d 593, 598 (Mo.App. E.D.1950); *see also Swanson v. Godwin,* 327 S.W.2d 903, 908–09 (Mo.1959) (once one undertakes to perform a duty, whether obligated to do so or not, he or she must exercise reasonable care in performing such duty). However, the court proceeded to rule that Joe's "conduct in the late 1970s cannot be found to be the proximate cause of [Dale's] injuries" since "it is apparent as a matter of law that tenant's action of the placing of the elevator back into service after the 1997 incident without adequate repairs having been made is a superceding cause which precludes liability based on [Joe's] actions in the late 1970s." This ruling was erroneous.

"The practical test of proximate cause is generally considered to be whether the negligence of the defendant is that cause or act of which the injury was the natural and probable consequence." *Krause v. U.S. Truck Co., Inc.,* 787 S.W.2d 708, 710 (Mo. banc 1990). Proximate cause will only be a question for the court when the evidence reveals the existence of an intervening cause. *Esmond v. Bituminous Cas. Corp.,* 23 S.W.3d 748, 753 (Mo. App. W.D.2000). "Usually, of course, the question of proximate cause (either sole or concurring) is a jury question." *Dickerson v. St. Louis Pub. Serv. Co.,* 365 Mo. 738, 286 S.W.2d 820, 826 (1956); *see also Esmond,* 23 S.W.3d at 753 ("The determination of the proximity of the causal relationship between the negligence and the injury is dependent upon the particular facts of each case, and so is generally an issue reserved for the trier of fact.").

Viewed in the light most favorable to Dale, we are constrained to hold that the summary judgment record does not support the trial court's ruling that the 1997 incident amounted to an intervening or superceding cause of Dale's injuries. While the trial court determined that the elevator was placed back in service after the 1997 incident "without adequate repairs having been made" by the Eggermans, as noted *supra* in our discussion of Dale's second point, there is a genuine factual issue regarding what repairs were made to the elevator's emergency brake system following that incident, as well as who may have made them. Therefore, if for no other reason, the issue of proximate cause remains a factual question for the jury to resolve.

Moreover, an intervening or superceding act will only be considered to have severed the causal connection when it is "independent of the original actor's negligence" and "eclipse[s] the role of the

original actor's negligence in the plaintiff's injury." *Esmond,* 23 S.W.3d at 753. The act must be a "new and independent force which so interrupts the chain of events that it becomes the responsible, direct, proximate and immediate cause of the injury." *Gathright v. Pendegraft,* 433 S.W.2d 299, 308 (Mo.1968) (internal quotation omitted).

In the case *sub judice,* after the 1997 incident, the Eggermans did not commit any act or omission constituting a "new and independent force" which so interrupted the sequence of events such that it became the responsible, direct, proximate, and immediate cause of Dale's injury, *which occurred when the chain originally installed by Joe and Walt broke.* After the 1997 incident, Les and Jean simply replaced the broken spline, repaired the broken wooden platform, and then returned the elevator to service with the electric chain hoist mechanism and emergency brake system exactly as Joe and Walt had left it, so that the elevator was operating just as if the 1997 incident never occurred. Furthermore, as noted *supra,* the summary judgment record contains evidence from Dale's expert witness, Joseph L. Stabler, that Dale's injuries were caused by "the physical modification of the subject elevator ... as performed by [Joe]." In particular, Stabler concluded that Joe's "unauthorized and unorthodox alteration of the subject elevator which included the installation of an electric chain hoist (non-elevator equipment) and removal of the car safety system followed by the failure to subsequently install or otherwise equip the elevator with a car

safety system, directly caused or contributed to cause Plaintiff Dale Lewis' injuries." [6] As the record clearly contains substantial evidence that it was Joe's original negligent acts that proximately caused the injury to Dale, rather than any act committed by the Eggermans, the trial court erred in entering summary judgment against Dale on the basis of an intervening cause.

■ "[I]n deciding questions of proximate cause and efficient, intervening cause, each case must be decided on its own facts, and it is seldom that one decision controls another." *Krause,* 787 S.W.2d at 710. Nevertheless, in its judgment, the trial court relied heavily on *Clymer v. Tennison,* 384 S.W.2d 829 (Mo. App. W.D.1964), finding it to be "very much in point with the case at bar." We need not further lengthen this opinion by rediscussing *Clymer* in detail, as we did in *Esmond,* 23 S.W.3d at 754–55. It suffices to say that the facts in *Clymer,* which involved a mechanical hay carrier mechanism that had been negligently reassembled after becoming dislodged and falling to the ground, are clearly distinguishable from those in the instant case because here, the Eggermans did not negligently forget to reinstall a critical subassembly that was operating properly before they repaired what portions of the elevator they knew to be broken and put it back into service.[7]

The trial court erred in ruling that, as a matter of law on the record before it, that Joe was not liable to Dale because the 1997 incident amounted to an intervening

---

**6.** Although the trial court gave Stabler's report lip service, it essentially ignored it as "not determinative," erroneously concluding that it merely established " 'but-for' causation."

**7.** As noted, "it is seldom that one decision controls another." *Krause,* 787 S.W.2d at 710. To the extent any case is sufficiently similar to influence disposition, we find *Jordan v. General Growth Development Corporation,* 675 S.W.2d 901 (Mo.App. W.D.1984) more instructive than *Clymer.*

or superceding cause of Dale's injuries. Dale's Point III is granted.[8]

In light of our disposition of Dale's Points II and III, we need not address his remaining two points.[9] The trial court's entry of summary judgment in favor of Mary on both counts of Dale's First Amended Petition for Damages and in favor of the defendant ad litem for Joe on the second count of the petition is affirmed. However, the court's entry of summary judgment in favor of the defendant ad litem for Joe on the first count of the petition is reversed and remanded for further proceedings not inconsistent with this opinion.[10]

All concur.

8. The record shows that in addressing and deciding this particular issue, the trial court assumed, without finally deciding, that the underlying legal basis for liability was sufficiently pled in paragraphs 11(a), 11(c), and 11(i) of Dale's First Amended Petition for Damages. The record also shows that Dale filed an Application for Leave to File Second Amended Petition for Damages, to which was attached the proposed second amended petition. The trial court denied the application in view of the "discussion of the issues in the case" presented in its judgment. As we have reversed the trial court's grant of summary judgment to the defendant ad litem for Joe on the first count of Dale's First Amended Petition for Damages in its entirety on substantive legal grounds, should he desire to do so, Dale may present another application for leave to file a second amended petition on remand.

9. Dale's fourth point raises a non-dispositive issue (*i.e.*, whether, under Missouri law and the terms of the lease, the lessor or the lessee was legally responsible for making repairs to the elevator after the 1997 incident), which was not decided by the trial court in its judgment and need not be decided by this court to resolve his appeal. Meanwhile, in his first point, Dale argues the trial court erred in granting summary judgment against him on the basis of legal theories that were not raised, briefed, argued, or addressed by any party below.

10. On June 14, 2006, Mary filed a Motion to Dismiss Appellant's Appeal or in the Alternative to Strike Appellant's Legal File, Brief and Appendix along with suggestions in support of the motion, in which she contended that Dale had committed various rather minor violations of Rule 81.12, Rule 84.04, and Western District Special Rule XIX. Two weeks later, Dale filed a thorough response to Mary's motion, which we took with the case. The motion is denied. "While not condoning noncompliance with the rules, a court will generally, as a matter of discretion, review on the merits where disposition is not hampered by the rule violations." *Doe v. Roman Catholic Diocese of Jefferson City*, 862 S.W.2d 338, 343 (Mo. banc 1993).